

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

ENTERED
03/18/2016

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **RAQUEL TRICIA KING,** | § | **Case No. 13-30301** |
| | § | |
| Debtor. | § | **Chapter 7** |
| | § | |

### MEMORANDUM OPINION REGARDING THE FIRST AND FINAL APPLICATION FOR COMPENSATION BY ATTORNEY FOR TRUSTEE, CAGE, HILL & NIEHAUS, L.L.P. FOR PERIOD MARCH 5, 2013 THROUGH NOVEMBER 2, 2015
[Doc. No. 133]

## I. INTRODUCTION

In *Matter of IFS Financial Corp.*, 803 F.3d 195, 209 (5th Cir. 2015), a case involving a Chapter 7 trustee from the Southern District of Texas who improperly billed the estate for his family's hotel charges, the Fifth Circuit affirmed the ruling removing the trustee from all of his cases due to his misconduct.  In the last paragraph of its opinion, the Fifth Circuit issued a telling reminder about a trial court's duty to preserve the integrity of the judicial system:

> The district courts and in turn the bankruptcy courts are the keepers of the temple. These courts rely on the bar to abide by its strict rules and norms of conduct. Bankruptcy practice presents many tasks attended and girded by strict identity of duty and diligence by its officers. The courts below were only minding their role: not to end, but to redirect a distinguished presence at the bar, and to give sustenance to necessarily demanding norms of practice. That this is expected does not diminish its importance.

*Id.*

Now before this Court is a final fee application of a law firm which has been representing one of the Southern District of Texas's other panel Chapter 7 trustees.  This application comes from the law firm where the Chapter 7 trustee is a name partner.   In assessing this application, it is painfully apparent that this trustee, just like the trustee in *IFS Financial*, has failed to abide by

the strict rules and norms of the bankruptcy system regarding what can be billed to the estate. Stated differently, he has violated his fiduciary duty to the creditors in this case by allowing his firm to seek illegitimate fees from the estate.  In complying with its duty to be a "keeper of the temple of justice," this Court will now take steps to minimize the chances of future violations of this fiduciary duty.  The Court writes this Memorandum Opinion to put all Chapter 7 trustees in the Southern District of Texas on notice that this Court will require more diligence on their part in supervising what services their own law firms should bill to the estate.[1]

Pursuant to Federal Bankruptcy Rules 9014 and 7052, this Court now issues the following Findings of Fact and Conclusions of Law.[2]  To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such.  To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such.  The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party. For the reasons set forth herein, the Court approves $42,140.75 of the requested fees (including the fees for preparing the Fee Application), and $3,712.26 of the requested expenses; and disapproves $81,141.50 of the requested fees and $847.77 of the requested expenses.

## II. Procedural History

1. On November 16, 2015, the law firm of Cage, Hill & Niehaus L.L.P. (the "Applicant") filed its First and Final Application for Compensation by Attorney for Trustee, Cage, Hill & Niehaus, L.L.P. for Period March 5, 2013 through November 2, 2015 (the "Fee Application").  [Doc. No. 133].  The Fee Application seeks approval for fees of

---

[1] The case at bar is not the only pending case before this Court involving a Chapter 7 trustee who has shirked his fiduciary duty to creditors by endorsing an affiliated law firm's request for illegitimate fees to be paid by the estate. The Court will issue a separate memorandum opinion in this other case addressing yet another trustee's failure to abide by the rules of the bankruptcy system.

[2] Any reference to a "Rule" is a reference to the Federal Rules of Bankruptcy Procedure. Further, any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted.

$123,282.25 and reimbursement of expenses totaling $4,560.03—resulting in an aggregate amount of $127,842.28.  [*See id.*].  The services described in the Fee Application relate to the Applicant's representation of Joseph M. Hill, who is the Chapter 7 trustee (the "Trustee") in this case.  The Trustee is also a name partner of the Applicant.

2.  On December 7, 2015, Western Surety Company ("Western Surety"), the largest unsecured creditor in this case, filed its Response and Limited Objection to the Fee Application, wherein it objected to the Applicant's requested fees as being "excessive and as not benefitting the Estate."  [Doc. No. 136, p. 1 of 5].  Moreover, Western Surety has objected to the Applicant seeking fees for services that Western Surety contends are tasks "that are part of the ordinary duties of a trustee and therefore, not compensable."  [*Id.*, p. 5 of 5].

3.  On January 28, 2016, this Court held a hearing on the Fee Application.  After listening to testimony and admitting exhibits, the Court heard closing arguments from the parties and then took the matter under advisement.

4.  On January 29, 2016, the Applicant filed a post-hearing Brief in Support of the Fee Application.  [Doc. No. 145].  The post-hearing brief concerned an issue that arose at the hearing: namely, whether the Trustee, after being requested to do so by Western Surety, should have dismissed the objection to discharge that it had filed against the Debtor in order for the estate to avoid incurring legal fees in prosecuting this cause of action.  [*Id.*].

5.   On February 2, 2016, Western Surety filed a response to the brief filed by the Applicant.  [Doc. No. 146].  This response cited case law and focused significantly on arguing that the Applicant is seeking fees for services that are non-compensable because they fall within the ordinary duties that the Trustee has under § 704(a).  [*Id.*].

6.   On February 8, 2016, the Applicant filed its Supplemental Brief in Support of the Fee

Application.  [Doc. No. 147].  This supplemental brief primarily focused on correcting

certain statements made by Western Surety in its response of February 2, 2016.

### III.  FINDINGS OF FACT

**A.  Filing of the Chapter 7 Petition and Appointment of the Trustee**

1.   On January 24, 2013, Raquel Tricia King (the "Debtor") filed a voluntary Chapter 7

petition.  [Doc. No. 1].

2.   On January 25, 2013, the Trustee was appointed in this case.  [*See* Doc. No. 8].

According to the resume that the Applicant submitted when seeking approval to represent

the Trustee, the Trustee has been practicing law in the State of Texas since 1976; has

been serving as a bankruptcy trustee since 1976; has administered thousands of Chapter 7

cases; and is often hired by other lawyers to handle complex bankruptcy matters.   He is

board-certified in business bankruptcy by the Texas Board of Legal Specialization and

the American Board of Certification.  [Doc. No. 25, p. 17 of 19].

**B.  Retention of Cage, Hill & Niehaus (i.e., the Applicant) as Counsel for the Trustee**

3.   On March 20, 2013, the Trustee filed his Application for Retention of Counsel for the

Trustee (the "Original Application to Employ").   [Doc. No. 18].   The Original

Application to Employ requested this Court to approve the Trustee's retention of his own

law firm (Cage, Hill & Niehaus, LLP) to represent him in this case.

4.   On April 15, 2013, the Trustee filed his Amended Application for Retention of Counsel

for the Trustee (the "Amended Application to Employ").  [Doc. No. 25].  In the Amended

Application to Employ, in footnote number 1, the Trustee made the following

representation to the Court: "The initial review and assessment of claims filed in the

4

debtors' cases is routinely undertaken by the trustee or his paralegals and law clerks without incurring legal fees."  [*Id.*, p. 5].

5.  On April 24, 2013, this Court entered an order granting the Amended Application to Employ.  [Doc. No. 30].

6.  On January 7, 2015, the Trustee filed his Second Amended Application for Retention of Counsel for the Trustee (the "Second Amended Application to Employ").  [Doc. No. 86]. The Trustee filed the Second Amended Application in order to obtain approval to add Sean Wilson as an additional attorney to provide services to the Trustee in this case. [*Id.*, p. 12 of 14].  Once again, in the Second Amended Application to Employ, in footnote number 1, the Trustee made the following representation to the Court: "The initial review and assessment of claims filed in the debtors' cases is routinely undertaken by the trustee or his paralegals and law clerks without incurring legal fees."  [*Id.*, p. 5].

7.  On February 19, 2015, this Court entered an order approving the Second Amended Application to Employ.  [Doc. No. 94].

**C.  Liquidation of Assets of the Estate**

8.  The Trustee has been able to recover approximately $191,000.00 for the estate. Approximately $179,000.00 was generated from the sale of certain real property located in Flatonia, Texas (the "Ranch").  [Doc. Nos. 116 & 120]. Approximately $8,000.00 was generated from the Debtor's turning over to the Trustee her tax refund.  [Hr'g Tr. 36:19−20, Jan. 28, 2016].  Finally, another $4,000.00 was generated from the Debtor's payment for exempting certain personal assets (i.e., jewelry).  [Hr'g Tr. 10:20−23; 36:20−21, Jan. 28, 2016].

**D.  The Trustee's Objection to Discharge**

9.  On June 21, 2013, the Applicant, on behalf of the Trustee, filed a complaint objecting to the Debtor's discharge (the "<u>Objection to Discharge</u>"), thereby initiating Adversary Proceeding No. 13-03142.  [Doc. No. 58]; [Adv. Proc. No. 13-03142, Adv. Doc. No. 1].

10.  On July 2, 2014, after holding a trial on the Objection to Discharge, this Court entered a Judgment of Non-Dischargeability with respect to Adversary Proceeding No. 13-03142, wherein the Court denied the Debtor her discharge. [Doc. No. 85]; [Adv. Proc. No. 13-03142, Adv. Doc. No. 26].

11.  Of the total fee figure of $123,282.25 requested in the Fee Application, $50,856.25 relates to legal services rendered for prosecution of the Objection to Discharge.

**E.  The Trustee's Objection to the Debtor's Exemptions**

12.  On July 17, 2013, the Applicant, on behalf of the Trustee, filed its objection to the Debtor's claim of exemptions (the "<u>Objection to Exemptions</u>").  [Doc. No. 61].

13.  On July 26, 2013, the Debtor filed a response to the Objection to Exemptions.  [Doc. No. 62].

14.  On October 23, 2013, this Court held a hearing on the Objection to Exemptions, and then continued this hearing to November 13, 2013.

15.  On November 13, 2013, this Court held the continued hearing on the Objection to Exemptions wherein the Court heard testimony and admitted exhibits.

16.  On December 2, 2013, this Court entered an Order on Trustee's Objection to Exemptions overruling the Trustee's Objection to Exemptions in its entirety.  [Doc. No. 83].

17.  Of the total fee figure of $123,282.25 requested in the Fee Application, $16,100.00 relates to legal services rendered for prosecution of the Objection to Exemptions.

**F.  Western Surety's Complaint to Determine Dischargeability**

18. On June 21, 2013, Western Surety filed a complaint objecting to the dischargeability of

the Debtor, thereby initiating Adversary Proceeding No. 13-03145.  [Doc. No. 59]; [Adv.

Proc. No. 13-03145, Adv. Doc. No. 1].

19. On October 17, 2014, Western Surety and the Debtor entered into an Agreed Final

Judgment wherein the parties stipulated that $200,000.00 of the debt owed to Western

Surety by the Debtor would be non-dischargeable.  [Adv. Proc. No. 13-03145, Adv. Doc.

No. 28].

**G.  Proofs of Claim That Have Been Filed by Unsecured Creditors**

20. Six unsecured creditors have filed proofs of claim in this case, none of which have been

challenged.   The names of these creditors, and the amounts that they claim, are as

follows:

| Name | Amount |
| --- | --- |
| Harris County TRA | $1,271.50 |
| American InfoSource LP as agent for DirectTV,LLC | $704.09 |
| Apache Stone Quarry, LLC | $16,607.11 |
| Western Surety | $2,729,777.53 |
| Frost Arnett Agt for MD Aesthetic Surgery Ctr | $1,020.00 |
| Atascocita Timbers Homeowners' Association Corp | $1,421.40 |
| **TOTAL:** | **$2,750,801.64** |

[Claim Nos. 1, 2, 3, 4, 5 & 6].

21. Western Surety holds 99.24% of all of the unsecured claims filed in this case.

**H.  Unpaid Administrative Claims**

22.  The major unpaid administrative claim in this case is the Trustee's statutory fee for

fulfilling his duties—a fee which will eventually be definitively determined once the

Trustee files an application for compensation and expenses pursuant to §§ 330(a)(1) and

(a)(7).  The maximum fee to which the Trustee is allowed is governed by § 326(a).  At the hearing on the Fee Application, the Applicant's only witness approximated this maximum fee to be $30,000.00.  [Hr'g Tr. 37:24−38:7, Jan. 28, 2016].[3]

23. The only other administrative claim that remains unpaid is the claim of the Trustee's accountant.  This accountant has requested fees of $4,936.00 and reimbursable expenses of $92.06, for a total amount of $5,204.33.  [Doc. No. 148].  The Court recently entered an order approving this amount.  [Doc. No. 154].

## I.  Estimation of Distributions to be Made to Administrative Claimants and Unsecured Creditors if this Court Approves the Fee Application in its Entirety

24. The Trustee has approximately $191,000.00 to distribute to holders of allowed claims.  [*See* Finding of Fact No. 8].   According to the testimony at the hearing, assuming that this Court grants the Fee Application in its entirety and also assuming that all other administrative claims are completely approved and paid, there will be approximately $19,000.00 remaining for distribution to general unsecured creditors after payment of these administrative claims.  [Hr'g Tr. 24:1−4, Jan. 28, 2016].   Based upon the percentage held by Western Surety, if the Trustee ends up distributing $19,000.00 to unsecured creditors, Western Surety will receive $18,855.60 (i.e., 99.24%), with the remaining $144.40 (i.e., 0.76%) to be paid to the other five unsecured creditors who have filed proofs of claim.  Thus, of the approximate amount of $191,000.00 of cash that the Trustee has recovered for the estate, [*see* Doc. No. 148], if this Court approves the Fee

---

[3] The Court emphasizes at this point that the Trustee has not yet filed any application requesting that he be paid this fee for services that he has rendered in his capacity as a Chapter 7 trustee.  Given this Court's concerns about the Trustee's failure to properly monitor his own law firm's billing in this case, the Court now puts the Trustee, as well as the U.S. Trustee, on notice that this Court will hold a hearing to determine whether the Trustee should receive the entire $30,000.00.  Section 326(a) gives this Court the discretion to award less than the maximum amount.  *In re Coyote Ranch Contractors, LLC*, 400 B.R. 84, 95 (Bankr. N.D. Tex. 2009); *In re Phillips*, 392 B.R. 378, 385 (Bankr. N.D. Ill. 2008) (holding that in the absence of clear and express statutory language, trustee compensation should not be afforded an absolute presumption of maximum compensation pursuant to Section 326(a)).

Application in its entirety, the Applicant will receive approximately 66.93% of total proceeds; the Trustee will receive approximately 15.71% of the total proceeds (for his statutory fee in his capacity as trustee); the Trustee's accountant will receive approximately 2.72% of the total proceeds; and the unsecured creditors will receive approximately 9.95% of the total proceeds.[4]

## IV. CREDIBILITY OF WITNESSES

Only one witness testified at the hearing on the Fee Application: Tim Wentworth ("Wentworth"), who is an associate attorney at the law firm of Cage, Hill & Niehaus (i.e., the Applicant). Wentworth has been practicing law for approximately 28 years, and has extensive experience representing Chapter 7 trustees; prior to entering private practice, Wentworth served as a law clerk to the Honorable United States Bankruptcy Judge Letitia Z. Paul. [Doc. No. 18-4, p. 4 of 4]. Wentworth gave narrative testimony in the Applicant's case-in-chief, and was cross-examined by Western Surety's counsel. His testimony covered some of the specific matters for which the Applicant represented the Trustee—such as the sale of the Ranch and the prosecution of the Objection to Discharge—and this testimony was credible. However, on balance, his testimony was not extensive. Indeed, he gave virtually no testimony on any of the numerous time entries associated with the Fee Application. As discussed herein, the absence of such testimony leads this Court to disapprove a portion of the requested fees.

---

[4] Some administrative claims, such as the real estate broker's fee and the appraisers' fees, have already been paid. The Court has also recently approved the fees requested by the Trustee's accountant; it is unclear at this time whether the Trustee has paid these fees. [*See* Finding of Fact No. 23].

## V.  CONCLUSIONS OF LAW

### A.  Jurisdiction, Venue, and Constitutional Authority to Enter a Final Order

1. Jurisdiction

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b).

Section 1334(b) provides that "the district courts shall have original but not exclusive

jurisdiction of all civil proceedings arising under title 11 [the Code], or arising in or related to

cases under title 11."  District courts may, in turn, refer these proceedings to the bankruptcy

judges for that district.  28 U.S.C. § 157(a).  In the Southern District of Texas, General Order

2012-6 (entitled General Order of Reference) automatically refers all eligible cases (which

include contested matters) and adversary proceedings to the bankruptcy courts.

This dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because it

concerns the administration of this Chapter 7 estate.  Further, it is a core proceeding pursuant to

28 U.S.C. § 157(b)(2)(B) because it involves the allowance or disallowance of claims against the

estate—namely, the Applicant's claim for fees and expenses.  Additionally, this contested matter

is core pursuant to 28 U.S.C. § 157(b)(2)(O) because it involves the adjustment of the debtor-

creditor relationship insofar as the fee and expense reimbursement request of the Applicant—a

creditor of the Debtor's estate—is being granted in part and denied in part.  Finally, this

contested matter is core pursuant to the general "catch-all" language of 28 U.S.C. § 157(b)(2).

*See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under

§157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its

nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re*

*Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006)

(holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even

10

though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").

    2. <u>Venue</u>

Venue is proper pursuant to 28 U.S.C. § 1408(1) because the Debtor resided in the Southern District of Texas for the 180 days prior to the filing of her Chapter 7 petition.

    3. <u>Constitutional Authority to Enter a Final Order</u>

In the wake of the Supreme Court's issuance of *Stern v. Marshall*, 131 S. Ct. 2594 (2011), this Court is required to determine whether it has the constitutional authority to enter a final order in any dispute brought before it. In *Stern*, which involved a core proceeding brought by the debtor under 28 U.S.C. § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 2620. As already noted above, the pending dispute before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O). Because *Stern* is replete with language emphasizing that the ruling is limited to the one specific type of core proceeding involved in that dispute, this Court concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order here. A core proceeding under § 157(b)(2)(A), (B), and (O) is entirely different than a core proceeding under § 157(b)(2)(C). *See, e.g.*, *Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547–48 (B.A.P. 8th Cir. 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); *see also In re Davis*, 538 F. App'x 440, 443 (5th Cir. 2013) *cert. denied sub nom. Tanguy v. W.*, 134 S. Ct. 1002 (2014) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect

to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect.' . . . We decline to extend *Stern*'s limited holding herein.").

Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under § 157(b)(2), *see In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern*'s 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2) . . . ."), this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order in the dispute at bar.  In *Stern*, the debtor filed a counterclaim based *solely* on state law; whereas, here, the claim brought by the Applicant is based solely on an express provision of the Bankruptcy Code (§ 330) and judicially-created bankruptcy law interpreting this provision.  This Court is therefore constitutionally authorized to enter a final order on the Fee Application.  *See In re Airhart*, 473 B.R. 178, 181 (Bankr. S.D. Tex. 2012) (noting that the court has constitutional authority to enter a final order when the dispute is based upon an express provision of the Code and no state law is involved).

Finally, in the alternative, this Court has the constitutional authority to enter a final order because all of the parties in this contested matter have consented, impliedly if not explicitly, to adjudication of this dispute by this Court.  *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947 (2015) ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be expressed. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent . . . .").  Indeed, the Applicant filed its Fee Application in this Court, [Doc. No. 133]; Western Surety filed its objection, [Doc. No. 136];

this Court held a hearing that lasted more than one hour; the Applicant then filed a post-hearing

brief, [Doc. No. 145], Western Surety filed a response to the post-hearing brief, [Doc. No. 146],

the Trustee thereafter filed a post-hearing supplemental brief, [Doc. No. 147]; and the parties

never objected to this Court's constitutional authority to enter a final order on the Fee

Application.  If these circumstances do not constitute implied consent, nothing does.

## B.  The Compensation Scheme Under the Code for Chapter 7 Trustees

In a case filed under Chapter 7, a trustee is appointed and required to fulfill certain duties

expressly set forth in § 704(a) of the Code.  Boiled down to a nutshell, the trustee is required to

manage and liquidate property of the estate, and then make distributions to creditors.   In

exchange for such services, § 330(a) allows the Court to award reasonable compensation to the

trustee for actual, necessary services and reimbursement for actual, necessary expenses;

however, this award is limited by § 326(a).   Specifically, for the rendition of services in a

Chapter 7 case, § 326(a) places a ceiling on the amount that can be awarded to the trustee, with

the award limited to an amount:

> Not to exceed 25 percent on the first $5,000 or less, 10 percent on any
> amount in excess of $5,000 but not in excess of $50,000, 5 percent on
> any amount in excess of $50,000 but not in excess of $1,000,000, and
> reasonable compensation not to exceed 3 percent of such moneys in
> excess of $1,000,000, upon all moneys disbursed or turned over in the
> case by the trustee to parties in interest, excluding the debtor, but
> including holders of secured claims.

11 U.S.C. § 326(a).

Thus, one source of income for any Chapter 7 trustee is payment for his services to the

estate in fulfilling his duties under § 704(a).

There is a second source of income that a trustee may also earn by his involvement in the

case.  Under § 327(a), a Chapter 7 trustee may receive court authorization to retain an attorney to

provide legal assistance in the performance of his assigned duties; and, if the trustee happens to be a licensed attorney, the Code specifically authorizes such a trustee to serve in a dual capacity as the attorney for the estate.  11 U.S.C. § 327(d).  Moreover, if the trustee, rather than being a solo practitioner, is instead a partner or an associate of a law firm, then the trustee, with court approval, is also allowed to retain his own law firm as counsel for the estate under § 327(d).  *See, e.g.*, *In re Edwards*, 510 B.R. 554, 560 (Bankr. S.D. Tex. 2014); *In re Butler Industries, Inc.*, 101 B.R. 194, 197 (Bankr. C.D. Ca. 1989).  Thus, the trustee can earn a second source of income by virtue of being a solo practitioner representing the estate or by being a partner or associate at a law firm that represents the estate.[5]  Of course, if compensation is to be awarded to this solo practitioner or law firm, then a fee application must be filed, and the court must evaluate the request for fees.

## C.  Legal Standards for Compensation of a Trustee's Own Law Firm That Represents the Trustee

The Code provisions governing the fee application of a trustee's own law firm are §§ 328(b) and 330(a).  The purpose of § 328(b) is to ensure that the trustee's firm is not compensated for rendering services that the trustee himself has a duty to undertake pursuant to § 704(a).  The purpose of § 330(a) is to ensure that the fees awarded to the trustee's firm are reasonable and only for services that were actually and necessarily rendered.

Thus, in those cases where the court has approved the estate's retention of the trustee himself or his law firm to serve as counsel for the estate, then thereafter, when an application is filed requesting approval for payment of fees for legal services rendered to the estate, the court

---

[5] How much income this second source can provide can widely vary. If the trustee is a solo practitioner, his share is 100% of the amount approved by the court. If he is a partner at a law firm representing the trustee, he will receive a proportionate share of the firm's profits—which will include the fees awarded for representing the estate. And, if the trustee is Of Counsel to the firm, then he might receive a percentage of the aggregate amount of the fees awarded by the court.

must conduct an analysis under both §§ 328(b) and 330(a). First, pursuant to § 328(b), the court must ensure that the services provided by the attorneys representing the estate are **_not_** services that fall within the statutory duties of the trustee. If the court were to approve fees for services rendered by the attorneys representing the estate that fall within the trustee's duties under § 704(a), then the court would be awarding a windfall to the trustee; and, by doing so, the creditors of the estate would suffer, as the trustee would be pocketing more funds from the estate that would otherwise be distributed to the creditors.

Once the Court has conducted its analysis under § 328(b) as to whether any fees should be disapproved because they relate to services within the statutory duties of the trustee, then the Court must analyze the services to determine if they pass muster under § 330(a)—i.e., were these services reasonable and necessary?

**D.  Performing the § 328(b) Analysis**

    1.  Under § 328(b), Certain Services Provided by the Law Firm are Not Compensable

Section 328(b) expressly provides that:

> If the court has authorized a trustee to serve as an attorney . . . for the estate under section 327(b) of this title, the court may allow compensation for the trustee's services as such attorney . . . only to the extent that the trustee performed services as attorney . . . for the estate **_and not for performance of any of the trustee's duties that are generally performed by a trustee without the assistance of any attorney . . . for the estate_**.

11 U.S.C. § 328(b) (emphasis added).

The emphasized language above leaves no doubt that the Trustee's own law firm may not receive compensation for rendering services that constitute performance of the Trustee's duties. This language necessarily begs the following question: What are the duties "that are generally performed by a trustee?"

The starting point in answering this question is § 704(a). This provision imposes the following duties on a Chapter 7 trustee:

1. collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest;

2. be accountable for all property received;

3. ensure that the debtor shall perform his intention as specified in section 521(2)(B) of this title;

4. investigate the financial affairs of the debtor;

5. if a purpose would be served, examine proofs of claim and object to the allowance of any claim that is improper;

6. if advisable, oppose the discharge of the debtor;

7. unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest;

8. if the business of the debtor is authorized to be operated, file with the court, with the United States trustee, and with any governmental unit charged with the responsibility for collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires;

9. make a final report and file a final account of the administration of the estate with the court and with the United States trustee;

10. if with respect to the debtor there is a claim for a domestic support obligation against the debtor, provide the applicable notice as specified in subsection (c);

11. if, at the time of the commencement of the case, the debtor (or any entity designated by the debtor) served as the administrator (as defined in section 3 of the Employee Retirement Income Security Act of 1974) of an employee benefit plan, continue to perform the obligations required of the administrator; and

16

12. use all reasonable and best efforts to transfer patients from a health care business that is in the process of being closed to an appropriate health care business that—(A) is in the vicinity of the health care business that is closing; (B) provides the patient with services that are substantially similar to those provided by the health care business that is in the process of being closed; and (C) maintains a reasonable quality of care.

11 U.S.C. § 704(a).

2.   The Intersection of the Trustee's Duties and the Providing of Legal Services

There is no question that some of the duties described by § 704(a) do not require any legal services at all. For example, meeting with a person who owes a debt to the estate in order to take possession of a check in payment of this debt is an activity that falls within § 704(a)(1) and assuredly does not require any legal assistance. Hence, if a trustee's law firm billed the estate for an attorney attending this meeting and taking possession of the check, the fee associated with these services would be disallowed. Services rendered that do not require a law license are *per se* non-compensable.

*Kusler* is a good example. *In re Kusler*, 224 B.R. 180 (Bankr. N.D. Okla. 1998). In that case, the court reviewed the timesheets of the firm that had represented the trustee; the trustee was also employed at this firm. The court found that several of the entries contained a description of services that did not constitute legal services rendered on behalf of the trustee but rather were activities that the trustee could undertake without an attorney's help. For example, the court found that communications between the trustee's lawyer and the trustee's auctioneer were not compensable: "A trustee is not entitled to hire a lawyer to communicate with an auctioneer regarding the details of an upcoming sale." *Id.* at 194. The court in *Kusler* denied the requested compensation related to such non-legal services as these. *Id.* at 194−95. Thus, in evaluating a fee application of a trustee's law firm, the threshold question to ask is whether any

17

of the services rendered were non-legal in nature.  If they were, then the compensation requested

for those services should be denied.  *In re Lexington Hearth Lamp and Leisure, LLC*, 402 B.R.

135, 142 (Bankr. M.D.N.C. 2009); *In re Virissimo*, 354 B.R. 284, 290 (Bankr. D. Nev. 2006); *In*

*re Howard Love Pipeline Supply Co.*, 253 B.R. 781, 788 (Bankr. E.D. Tex. 2000) ("The purpose

of the attorney for the trustee is . . . to provide assistance with the services the trustee is unable to

perform due to the lack of a license to practice law.").

However, other duties of the trustee described in § 704(a) do definitely require legal

services involving a specific skill set.  For example, § 704(a)(6) requires a trustee, if advisable, to

oppose the debtor's discharge.  11 U.S.C. § 704(a)(6).  The only vehicle for fulfilling this duty is

to draft, file, and prosecute an objection to discharge.  Indeed, this task typically involves a full-

blown trial on the merits that requires detailed examination of the debtor under oath.  Thus, this

particular duty of a trustee requires specialized legal expertise—actually trying a lawsuit—

beyond the expertise that is expected of a trustee; and if a trustee's own law firm prosecutes an

objection to discharge, the firm is entitled to recover the fees for doing so.  *In re Holub*, 129 B.R.

293, 296 (Bankr. M.D. Fla. 1991) ("In general, professional time is limited to those tasks

performed while representing the trustee in the prosecution of contested matters and adversary

proceedings . . . ."); *Virissimo*, 354 B.R. at 290 ("Under this analysis, the professional skills of an

attorney are required when there is an adversary proceeding or a contested motion that requires

the trustee [in his capacity as the attorney of the estate] to appear and prosecute and defend . . .").

The two examples cited above are fairly easy to characterize as duties involving "non-

legal" and "legal" services. And, there are other duties under § 704(a) that clearly encompass

only one or the other of these two types of categories. But, there is a third scenario—one which

one court has described as "this nebulous gray area" and another court has described as one

18

where "the line is not drawn as precisely as [the trustee] might wish." *Kusler*, 224 B.R. at 193; *Lexington*, 402 B.R. at 146.

3. <u>The Third Scenario</u>

This third scenario involves rendering services which are legal in nature, but which are so closely related to the trustee's duties under § 704(a) that they arguably should not be compensated. For example, the duty of a trustee under § 704(a)(5) is "if a purpose would be served, [to] examine any proofs of claim and object to the allowance of any claim that is improper." 11 U.S.C. § 704(a)(5). If a trustee reviews a proof of claim that contains no supporting documentation, thereby necessitating the filing of an objection, should the trustee's firm receive compensation for the legal services of drafting and filing the objection? After all, drafting and filing a pleading does constitute providing legal services. Or, is the mere drafting and filing of a short pleading that objects on the basis that no documentation is attached such a ministerial task that no compensation should be allowed?

The court in *In re Lowery*, 215 B.R. 140 (Bankr. N.D. Ohio 1997), provides a persuasive argument that no fees should be awarded. In *Lowery*, the court differentiated between the services that an attorney provides for a lay person (for which compensation would be allowed) from services provided to a Chapter 7 trustee (for which compensation should not be allowed):

> [T]he duties for which the attorney may be compensated are far more constricted in this [Chapter 7] setting than that posited by the applicant here: that when a lay person employs an attorney to, say, recover an asset, all that accompanies that effort, including the time in investigating, letter writing, phone calling and the hiring of other professionals, such as appraisers or real estate brokers, is compensable to the attorney. Those activities surely fall within the ambit of § 704, the Code's defined duties of the trustee *who obviously has the skill and expertise to perform them by virtue of being a member of the United States Trustee's panel of trustees. The trustee is simply and obviously not a lay person unschooled in the art and science of finding, capturing and obtaining the value of an asset, for example.*

19

*Id.* at 141−42 (emphasis added).   The *Lowery* court thus denied the requested fees from the

trustee's law firm on the grounds that the trustee—having been chosen by the U.S. Trustee—had

the skill set himself to perform the tasks that the law firm had rendered, even if the services were

legal in nature.

*Lowery*'s emphasis on the trustee having the ability and intelligence to have been named

as a panel trustee is no mean point. One of the primary responsibilities of each U.S. Trustee is to

"establish, maintain, and supervise" a panel of persons who are eligible and available to serve as

a trustee in cases filed under Chapter 7 of the Code. 28 U.S.C. § 586(a). The eligibility

requirements are established by the Attorney General under § 586(d) and are set forth in 28

C.F.R. § 58.3:

> The qualifications for membership on the panel are as follows:
> (1) Possess integrity and good moral character.
> (2) Be physically and mentally able to satisfactorily perform a trustee's duties.
> (3) Be courteous and accessible to all parties with reasonable inquiries or comments about a case for which such individual is serving as private trustee.
> (4) Be free of prejudices against any individual, entity, or group of individuals or entities which would interfere with unbiased performance of a trustee's duties.
> (5) Not be related by affinity or consanguinity within the degree of first cousin to any employee of the Executive Office for United States Trustees of the Department of Justice, or to any employee of the office of the U.S. Trustee for the district in which he or she is applying.
> (6)(i) Be a member in good standing of the bar of the highest court of a state or of the District of Columbia; or
> (ii) Be a certified public accountant; or
> (iii) Hold a bachelor's degree from a full four-year course of study (or the equivalent) of an accredited college or university (accredited as described in part II, § III of Handbook X118 promulgated by the U.S. Office of Personnel Management) with a major in a business-related field of study or at least 20 semester-hours of business-related courses; or hold a master's or doctoral degree in a business-

related field of study from a college or university of the type
described above; or

(iv) Be a senior law student or candidate for a master's degree in
business administration recommended by the relevant law school or
business school dean and working under the direct supervision of:

    (A) A member of a law school faculty; or

    (B) A member of a panel of private trustees; or

    (C) A member of a program established by the local bar
    association to provide clinical experience to students; or

(v) Have equivalent experience as deemed acceptable by the U.S.
Trustee.

28 C.F.R. § 58.3(b).

The above-described requirements underscore that in order to be chosen as a panel trustee, a person must be sophisticated—at least in legal affairs or business matters. A trustee therefore necessarily has a greater skill set than a layman in performing duties such as investigating a debtor's financial affairs or writing letters to collect debts.  In the eyes of the *Lowery* court, this greater skill set must be taken into account when analyzing whether the services rendered by a trustee's law firm are compensable.

Other courts agree with the principle articulated in *Lowery*, although they express themselves somewhat differently.  For example, the Fourth Circuit expresses its agreement in this manner: "Only when ***unique difficulties*** arise may compensation be provided for services which coincide or overlap with the trustee's duties, and only to the extent of matters requiring legal expertise."  *In re J.W. Knapp Company*, 930 F.2d 386, 388 (4th Cir. 1991) (emphasis added).  A bankruptcy court in Oregon expresses its agreement in this way: "In ***unique circumstances*** when matters normally handled by the trustee involve complex legal issues, and the applicant has demonstrated the need for his involvement, courts have allowed compensation."  *In re Smith*, 2008 WL 2852263, at *8 (Bankr. D. Or. July 23, 2008) (emphasis added); *see also Virissimo*, 354 B.R. at 293 ("There is no showing that either the records

searches, the deed orders, the communications, or the review of the pending lawsuits presented ***unique difficulties*** that required the professional expertise of an attorney.") (emphasis added).

This Court agrees with the principle articulated in these cases: namely, that a trustee, as a sophisticated person, cannot conveniently delegate his statutory duties to his own law firm to perform and thereafter allow this firm to charge the estate; he can only obtain legal services chargeable to the estate where "unique difficulties" arise and resolving such difficulties is beyond his skill set.

And, it is important to emphasize that if the trustee's own law firm wants the estate to pay its fees for services rendered, the burden is on the firm to justify this request. *Howard Love*, 253 B.R. at 788. "The burden rests on the attorney requesting compensation to justify the services rendered. Where insufficient explanatory information is provided for determining the precise nature of the services rendered, the [C]ourt is compelled to determine that the services are not compensable as legal services." *Id.*; *Kusler*, 224 B.R. at 186 ("The burden rests upon the trustee to establish that the services for which compensation is sought constitute services outside the scope of the trustee's ordinary duties."). In fact, one court has suggested that this burden should be higher for a trustee's own law firm than for an unaffiliated law firm seeking its fees because "with the privilege of hiring one's own law firm comes a commensurate burden to ***strictly*** review the tasks included and compensation sought in fee applications. The trustee is not entitled to compensation as an attorney for services which can and should be performed by the trustee." *Kusler*, 224 B.R. at 193 (emphasis added). This Court concurs with this view. Indeed, this Court believes that the argument for heightened scrutiny is even more compelling when the trustee's own law firm is seeking fees ***and*** when the trustee himself has been serving in that capacity for many years—which means he has, or should have, developed a keen sense of

knowing when it is appropriate to allow his law firm to render services which are compensable from the estate. Stated differently, the more experienced and sophisticated a trustee is in legal and business affairs, the greater scrutiny should be given to any fee request by his own law firm.

    4.  Application of the Law to the Third Scenario

    Two cases—*Lexington* and *Howard Love*—aptly illustrate how courts have analyzed fee applications of trustees' firms when dealing with this third scenario. *Lexington*, 402 B.R. at 137; *Howard Love*, 253 B.R. at 784. In *Lexington*, the court, in disapproving certain fees requested by the trustee's law firm, identified categories to explain its decision. 402 B.R. at 144−46. Additionally, this court linked the express language of § 704(a) with the category utilized by the court. These categories, and the specific § 704(a) language cited by the court, were as follows: (1) "Reviewing the Debtor's Records" ["investigate the financial affairs of the debtor" pursuant to § 704(a)(4)"]; (2) "Investigating Estate Property" ["investigate the financial affairs of the debtor" pursuant to § 704(a)(4)"]; (3) "Communicating with other parties" ["furnish such information concerning the estate and the estate's administration as is requested by a party in interest" pursuant to § 704(a)(7)]; (4) "Reviewing and Objecting to Claims" ["examine proofs of claims and object to the allowance of any claim that is improper" pursuant to § 704(a)(5)]; (5) "Communicating with and Supervising Estate Professionals" ["furnish such information concerning the estate and the estate's administration as is requested by a party in interest" pursuant to § 704(a)(7)]; and (6) "Selling or Disposing of Estate Assets" ["collect and reduce to money the property of the estate for which such trustee serves" pursuant to § 704(a)(1)]. *Id.* After categorizing the fee entries, the Court denied various entries on the grounds that the trustee (who, as a solo practitioner, was also the attorney for the estate) had failed to satisfy his burden of establishing entitlement to the requested fees. *Id.* at 145−46

("When it appeared from a particular entry that [the trustee/attorney] was using his legal skill or knowledge, even though the task could be categorized as a trustee duty, then compensation was allowed. The line is not easily drawn. Given the lack of detail in certain time entries and his failure to supplement the Applications, [the trustee/attorney] has himself to blame if the line is not drawn as precisely as he might wish.").

In *Howard Love*, the court disapproved requested fees associated with certain services rendered by attorneys at the trustee's law firm. In disapproving these fees, the court, similar to the approach taken by the court in *Lexington*, categorized each time entry to facilitate the explanation of why the services fell within the routine duties of the trustee under § 704(a) and therefore were not compensable. These categories were as follows: (1) "claim review/evaluation;" (2) "property demand;" (3) "creditor communication/asset disposition;" (4) "asset dispositions;" (5) "asset investigation;" and (6) "review of pleadings" and "simple review of pleadings." *Howard Love*, 253 B.R. at 792−94. Once again, after categorizing the fee entries, the Court denied various time entries on the grounds that the trustee (who, as a solo practitioner, was also the attorney for the estate) had failed to satisfy his burden of establishing entitlement to the requested fees. *Id.* at 791−92 ("To the extent that the trustee-attorney fails to demonstrate the necessity of the legal services or the description of such services improperly lumps legal and trustee services together, attorney compensation for those services will be disallowed.").

The courts in *Lexington* and *Howard Love* thus disallowed fees for services that, although legal in nature, nevertheless came within the normal duties of a trustee. Stated differently, these services did not involve—to use the Fourth Circuit's lexicon—"unique difficulties" beyond the trustee's ability to handle. *Knapp*, 930 F.2d at 388. The rulings in *Lexington* and *Howard Love* comport with the holding in *Lowery*, 215 B.R. at 140. Indeed, rulings from numerous courts

throughout the country have accepted this principle, although they base their decisions not by reference to a lack of "unique circumstances" beyond the trustee's ability to handle, but rather by reference to the services as being "routine," *see, e.g.*, *In re Butterbaugh*, 135 B.R. 507, 509 (Bankr. N.D. Ohio 1991) (denying request for compensation by the trustee's attorney for time "entries relating to routine telephone calls and correspondence with information seekers"), or "administrative," or "ordinary," *see Kusler*, 224 B.R. at 186.

It is noteworthy that *Howard Love*, unlike *Lexington*, adds a category not in the "laundry list" of a trustee's duties enumerated in § 704(a), but one which that court nevertheless found to be disqualifying as a compensable service: namely, "review of pleading" or "simple review of pleadings."   *Howard Love*, 253 B.R. at 792.  This Court agrees with the *Howard Love* court on this point.   A trustee does not require legal assistance to review a pleading.  If, after reading the pleadings, the trustee decides that he needs legal assistance, then he can apply to the court to retain counsel, and, if approved, then counsel can render legal services with regard to that pleading—and those services are compensable.

In sum, based upon § 328(b) and persuasive case law in evaluating the fee application of a trustee's law firm, this Court makes the following conclusions.  First, any non-legal services are *per se* non-compensable.  Second, any legal services that require special expertise are *per se* compensable.  Third, any services falling into any of the following categories are presumptively non-compensable:

> (1) **Claim review and evaluation.**  *See, e.g.*, *Lexington*, 402 B.R. at 144−46; *Howard Love*, 253 B.R. at 792−93; *In re Haggerty*, 215 B.R. 84, 86 (Bankr. M.D. Fla. 1997) ("[T]he making of routine objections to claims in this case constitutes performance of the trustee's duties, and is not compensable as professional time."); *In re McKenna*, 93 B.R. 238, 242 (Bankr. E.D. Ca. 1988) ("This analysis is consistent with decisions in

which other courts have held that the following are trustee duties for which attorney's fees are not allowed: . . . Preparing and filing objections to claims . . . .").

(2) **Claim objection.** *See, e.g.*, *Lexington*, 402 B.R. at 144−46; *Howard Love*, 253 B.R. at 792−93; *Haggerty*, 215 B.R. at 86 ("[T]he making of routine objections to claims in this case constitutes performance of the trustee's duties, and is not compensable as professional time."); *In re Perkins*, 244 B.R. 835, 843 (Bankr. D. Mont. 2000) ("[T]he Court concludes that routine objections to claims which are unopposed and do not require legal analysis or a brief, fall within a trustee's duties and may not be compensated as professional services.").

(3) **Property demand**. *See, e.g.*, *Lexington*, 402 B.R. at 144−46; *Howard Love*, 253 B.R. at 793; *In re Moon*, 258 B.R. 828, 832 (Bankr. N.D. Fla. 2001) ("The primary duty of a Chapter 7 trustee is to collect and reduce to money the property of the estate as is compatible with the best interest of the parties at interest.");  11 U.S.C. § 704(a)(1) ("The trustee shall— collect and reduce to money the property of the estate for which such trustee serves . . . .").

(4) **Communication with creditors and other parties-in-interest.**  *See, e.g.*, *Lexington*, 402 B.R. at 144−46; *Howard Love*, 253 B.R. at 792−93; *McKenna*, 93 B.R. at 242 ("This analysis is consistent with decisions in which other courts have held that the following are trustee duties for which attorney's fees are not allowed: . . . Corresponding with creditors re documentation of claims . . . ."); *In the Matter of Minton Group, Inc.*, 33 B.R. 38, 41 (Bankr. S.D.N.Y. 1983) ("[T]he court must be mindful that routine and ministerial services, such as telephone calls and correspondence with creditors and information seekers should not be compensated at billable rates attributable to truly legal services.").

(5) **Investigation of estate property.**  *See, e.g.*, *Lexington*, 402 B.R. at 144−46; *Howard Love*, 253 B.R. at 792−93; *Virissimo*, 354 B.R. at 294 ("Viewing a debtor's property . . . is part of a trustee's duty to investigate the affairs of the debtor . . . ."); *In re Finney*, 1997 WL 33475580, at *27−28 (Bankr. E.D. Va. Feb. 26, 1997) (holding that the

gathering of information concerning the debtor is not "normally done by the legal counsel for the trustee, nor [does this task] require legal counsel to be successfully completed").

(6) **Selling or disposing of assets.**  *See, e.g.*, *Lexington*, 402 B.R. at 144−46; *Howard Love*, 253 B.R. at 792−93; *In re McAuley Textile Corp.*, 11 B.R. 646, 648−49 ("Unless accompanied by unusual difficulties, the actual performance of fiduciary duties of the receiver and trustee in bankruptcy are their own responsibility not the responsibility of their counsel; including . . . sell[ing] real estate of the business.") (citation omitted); *In re Boltec Industries, Inc.*, 1993 WL 853018, at *2 (Bankr. E.D. Mich. Jan. 8, 1993) ("The trustee in bankruptcy has a statutory duty to sell the property. These services are to be performed by the trustee and not delegated to his lawyer. The attorney is not entitled to compensation for the performance of the trustee's duties.") (citation omitted).

(7) **Communication with and supervision of estate professionals.**  *See, e.g.*, *Lexington*, 402 B.R. at 144−46; *Howard Love*, 253 B.R. at 792 n. 14 (referencing the act of "corresponding with estate professionals" as part of the non-exhaustive list of services subject to the § 326(a) statutory limitation); *Holub*, 129 B.R. at 295−96 ("The court generally considers the following kinds of services to be those to be performed by the trustee and are not compensable as professional services rendered to the trustee: . . . Supervision of professionals (other than self) . . . .").

(8) **Review of the debtor's records.**  *See, e.g.*, *Lexington*, 402 B.R. at 144−46; *Howard Love*, 253 B.R. at 792−93; *In re King*, 88 B.R. 768, 771 (Bankr. E.D. Va. 1988) ("[W]e are in agreement with the U.S. Trustee's position, for in contravention of the standards applicable to an attorney appointed to represent the trustee, counsel in the case at bar requested compensation for time spent reviewing the debtor's files . . . [and] [i]n view of the administrative nature of [this] service[], we cannot approve the respective fees requested, as the services rendered were statutorily required of the trustee himself.").

(9) **Review of pleadings.**  *See, e.g.*, *Lexington*, 402 B.R. at 144−46; *Howard Love*, 253 B.R. at 792 (concluding that "review of pleadings" and "simple review of

27

pleadings" "constitute the performance of trustee duties which cannot be properly compensated as attorney services").

If the trustee's law firm wants to overcome the presumption of non-compensability, then it needs to make a record—through adducing testimony and/or introducing exhibits—showing how the services rendered involved "unique difficulties" beyond the trustee's own ability to handle these issues. *Kusler*, 224 B.R. at 186 ("The burden rests upon the trustee to establish that the services for which compensation is sought constitute services outside the scope of the trustee's ordinary duties."); *Lexington*, 402 B.R. at 146 n. 18 ("The burden is on the attorney to establish that services for which compensation is sought constitute services outside the scope of the trustee's ordinary duties."). Indeed, given the heightened scrutiny that comes with reviewing a fee application of a trustee's own law firm, *Kusler*, 224 B.R. at 193, the law firm's ability to satisfy its burden of proof requires specific and substantive testimony about the services that have been provided. It is insufficient for the trustee or the attorney providing the services to simply take the stand and say that the services are "justified." *See id.* at 194. For example, if an attorney has billed for conferring with a prospective purchaser of property, either that attorney— or, more appropriately, the trustee—needs to testify as to why communicating with this prospective purchaser involved "unique difficulties" beyond the trustee's ability to deal with this individual.

5.   Application of § 328(b) to the Case at Bar

Western Surety has lodged an objection to the Fee Application. However, even if no objection had been lodged, this Court has an independent duty to examine all fee requests made by counsel. *See In re WNS, Inc.*, 150 B.R. 663, 664 (Bankr. S.D. Tex. 1993) ("Even if no objections are raised to a fee application, the Court is not bound to award the fees sought, and it

has the duty to independently examine the reasonableness of the fees."); *In re Poseidon Pools of Am., Inc.*, 180 B.R. 718, 728 (Bankr. E.D.N.Y. 1995) (holding that the court must "examine the propriety of fees and expenses even where no objections are raised"). Thus, the Court's analysis of the Fee Application at bar addresses not only issues raised by Western Surety, but also issues that this Court raises *sua sponte*.

Application of the legal standards discussed above to the Fee Application in this case leads this Court to conclude that: (1) the Trustee's law firm (i.e., the Applicant) is seeking compensation for numerous non-legal services that are *per se* non-compensable; and (2) the Applicant is requesting compensation for many services that are presumptively non-compensable and it has failed to meet its burden of establishing that these particular services involved "unique difficulties" beyond the Trustee's abilities.

### a. *Services Rendered by Sean Wilson that are Disallowed*

The Applicant seeks compensation for certain services rendered by an associate attorney named Sean Wilson ("Wilson"), whose services are billed out at $230.00 per hour. [Trustee's Ex. No. 1, p. 10 of 11]. The following time entries were billed by Wilson in 2013:

> 06/13/2013—Organization of King's papers for life insurance accounts for Tim (0.80 - $88.00)
>
> 06/13/2013— Organization of documents of client's life insurance accounts for Tim (3.70 - $407.00)
>
> 06/17/2013—Organization of Client's life insurance accounts for Tim (1.10 - $121.00)

The Court finds these services to be non-compensable for three separate and distinct reasons. First, these are non-legal services that are non-compensable *per se*. *See Knapp*, 930 F.2d at 386 (reversing district court's affirmance of bankruptcy court's award of fees to trustee's attorney in connection with reviewing, preparing, and reorganizing checks, holding that these

29

services were "ministerial duties of the trustee").  Second, if they somehow are legal services, they constitute "review of the debtor's records" that are presumptively non-compensable.  *See Lexington*, 402 B.R. at 144−46.  At the hearing on the Fee Application, the Applicant gave no testimony and introduced no exhibits to overcome this presumption.  Third, at the time that Wilson rendered these services in 2013, he was not one of the Applicant's attorneys whom this Court had authorized to provide services to the Trustee.  It was not until January 7, 2015 that the Trustee filed the Second Amended Application to Employ seeking approval for Wilson to be one of the Applicant's attorneys authorized to provide services to the estate, [Finding of Fact No. 6]; and this Court did not authorize Wilson to provide services until February 19, 2015, when this Court entered an order approving the Second Amended Application to Employ, [Finding of Fact No. 7].  Thus, for all of these reasons, this Court will not approve the $616.00 requested for Wilson's services in 2013.

Once this Court did approve Wilson as one of the authorized attorneys of the Applicant, he did undertake certain tasks.  Indeed, there are 30 time entries for services that Wilson provided in 2015 relating to the Ranch.  [Trustee's Ex. No. 1, p. 10 of 11].  They involved the following: (1) Wilson conferring with Wentworth to receive an assignment from Wentworth to travel to the Ranch to take photographs of this property, to obtain a locksmith to change the locks, and to provide access to the real estate broker to this property; (2) Wilson making a determination of the address of the Ranch; (3) Wilson finding a locksmith and thereafter communicating with this individual about changing locks to the Ranch; (4) Wilson communicating with the realtor whom the Trustee retained to sell the Ranch; (5) Wilson drafting a notice to post on the Ranch that the Trustee owns and controls the Ranch; (6) Wilson actually traveling from Houston to the Ranch; (7) Wilson working on unlocking the front gate to the

Ranch; (8) Wilson taking pictures of various locations of the 110 acres comprising the Ranch; (9) Wilson waiting on the locksmith to finish changing the locks on the doors of the Ranch; (10) Wilson securing the Ranch and then locking the front gate; (11) Wilson posting notice on the doors to the Ranch that the Trustee owns and controls the Property; (12) Wilson traveling back to Houston from the Ranch; (13) Wilson conferring with Wentworth regarding what assets are located on the Ranch; (14) Wilson conferring by telephone with the locksmith to discuss the latter's invoice for services rendered; (15) Wilson uploading the pictures on the Ranch; (16) Wilson conferring with the Applicant's office manager (Debbie Davis) to discuss how to pay the locksmith's invoice; and (17) Wilson sending a letter to the locksmith from writing a check for the services already rendered on the Ranch.  [*Id.*].  The total value of these services amount to 12.90 hours and $2,967.00 in billings.

There is no question that the compensation requested for these services should be denied because they have nothing to do with practicing law; they are non-legal services and therefore *per se* non-compensable.  Alternatively, even if the tasks that Wilson performed somehow do constitute legal services, they concern locating and taking control of property of the estate; which involves the "investigation of estate property."**6**  This is a routine duty that belongs to the Trustee, not to any attorney.  Indeed, Wentworth himself, on cross-examination, when asked whether the services provided by Wilson could have been done by the Trustee without involving an attorney or a paralegal, Wentworth responded in the affirmative.  [Hr'g Tr. 28:10−20, Jan. 28,

---

**6** The Applicant itself categorizes Wilson's tasks as "sale of assets."  [Trustee's Ex. No. 1, p. 8 of 11].  Given what Wilson actually did, this Court disagrees with this categorization.  However, even if this Court accepts this categorization, Wilson's services fall within the presumptively not compensable category of "selling or disposing of assets."  Because the Applicant failed to provide testimony to regarding how these services concern "unique difficulties" beyond the Trustee's ability to handle, it has not satisfied its burden in overcoming the presumption.

2016]. For all these reasons, the Court denies the $2,967.00 fee request associated with Wilson's 2015 time entries.

In sum, this Court denies a total of $3,583.00 (i.e., $616.00 + $2,967.00) for fees relating to the time entries of Wilson set forth above.

### b.  *Services Rendered by Wentworth that are Disallowed*

Wentworth made the time entries set forth below during the time frame of April 2013 through August 2015. The Court finds that these time entries describe services that: (1) are non-legal and therefore *per se* non-compensable; or (2) fall within one of the specific categories that are presumptively non-compensable. After each time entry, this Court sets forth in italics one or more of the nine specific categories that are presumptively non-compensable,[7] and also sets forth if the time entry constitutes "non-legal services." These italicized phrases represent this Court's findings and conclusions that the specific services rendered fall into one or more of the categories that are presumptively non-compensable.[8] Further, this Court finds that the Applicant failed to introduce sufficient, if any, evidence to overcome the strong presumption that any of the services set forth in these time entries related to "unique difficulties" beyond the Trustee's ability to handle.[9]

> 03/05/2013—Review of schedules and statements regarding collection of property awarded in divorce (0.50 - $197.50) [*review of pleadings; investigation of estate property*]
>
> 03/05/2013—Review of divorce decree, respond to J. Koenig [i.e., counsel for E. Boutte] regarding meeting with ex-husband (0.30 - $118.50) [*review of pleadings*; *investigation of estate property*]

---

[7] *See supra* Part V.D.4.

[8] The Court has also used brackets to identify who each individual is when his/her name is shown in the time entry. For example, the bracket term of "[i.e., artwork appraiser]" identifies "J. Adair" as the artwork appraiser.

[9] The Court notes that the Applicant does not list time entries in chronological order. However, for purposes of organization, the dates for each time entry set forth hereinafter are listed in chronological order.

04/03/2013—Emails with N. Hamren [i.e., counsel for Western Surety] regarding production of documents by Debtor, extension of discharge deadline (0.20 - $79.00) [*review of the debtor's records; communications with creditor and other parties-in-interest*]

04/03/2013—Telephone conference with L. Green [i.e., Debtor's counsel] regarding turnover of records and inspection of personal property (0.20 - $79.00) [*investigation of estate property*]

04/08/2013—Review of documents produced by Debtor (1.10 - $434.50) [*review of the debtor's records*]

04/09/2013—Telephone conference with J. Adair [i.e., artwork appraiser] regarding appraisal of personal property, email to J. Adair regarding same (0.20 - $79.00) [*investigation of estate property; communication with and supervision of estate professionals; selling or disposing of assets*]

**04/10/2013—Review of documents provided by Debtor, email to L. Greene [i.e., Debtor's counsel] regarding additional documents needed (0.70 - $276.50) [*review of the debtor's records; communication with creditors and other parties-in-interest*]**[10]

04/16/2013—Telephone conference with L. Greene [i.e., Debtor's counsel] regarding production of documents, review of file regarding same (0.30 - $118.50) [*review of the debtor's records; communication with creditors and other parties-in-interest*]

**04/17/2013—Review of information on personal property appraisal from J. Adair [i.e., artwork appraiser], telephone conference with S. Sandler [i.e., jewelry appraiser] regarding jewelry appraisal (0.60 - $237.00) [*selling or disposing of assets; investigation of estate property*]**

04/22/2013—Respond to email from J. Koenig [i.e., counsel for E. Boutte] regarding status of investigation (0.10 - $39.50) [*investigation of estate property; communication with creditors and other parties-in-interest*]

**05/06/2013—Review of documents regarding valuation of EAS Development, email to E. Boutte [i.e., Debtor's ex-husband] regarding further documentation (0.60 - $237.00) [*investigation of estate property; review of debtor's records; communication with creditors and other parties-in-interest*]**

---

[10] Any entries in this section that are bolded denote that this Court is also denying compensation because these entries are either lumped or vague, as discussed in more detail below. Hence, even if this Court is incorrect that any of the bolded entries should be excluded under the § 328(b) analysis, in the alternative, they should be disallowed due to lumping or vagueness. It should be noted that the fees associated with the bolded entries are not included in the total amount deducted in this section, as they are being deducted in the section discussing lumping. *See infra* Part V.E.1(a)(i)-(ii).

05/08/2013—Respond to email from E. Boutte [i.e., Debtor's ex-husband] regarding information needed, review of file regarding same (0.30 - $118.50) [*investigation of estate property*; *communication with creditors and other parties-in-interest*]

05/09/2013—Exchange emails with L. Greene [i.e., Debtor's counsel] regarding production of documents (.30); telephone conference with E. Boutte [i.e., Debtor's ex-husband] regarding production of documents (.20); review of file regarding same (.20) ($276.50) [*review of the debtor's records; communication with creditors and other parties-in-interest*]

05/23/2013—Telephone conference with S. Sandler [i.e., jewelry appraiser], J. Adair [i.e., artwork appraiser], email to L. Greene [i.e., Debtor's counsel] regarding access to inspect personal property, email to appraisers regarding same (0.50 - $197.50) [*selling or disposing of assets; investigation of estate property; communication with creditors and other parties-in-interest; communication with and supervision of estate professionals*]

**05/17/2013—Meeting with Eric Boutte [i.e., Debtor's ex-husband] (0.90 - $355.50) [*investigation of estate property*; *communication with creditors and other parties-in-interest*]**

05/28/2013—Telephone conference with E. Boutte [i.e., Debtor's ex-husband] regarding production of records (0.30 - $118.50) [*communication with creditors and other parties-in-interest*]

05/30/2013—Review of order for turnover, email to E. Boutte [i.e., Debtor's ex-husband] regarding same, review of file (0.20 - $79.00) [*investigation of estate property; communication with creditors and other parties-in-interest; review of pleadings*]

05/30/2013—Review of documents regarding potential hidden assets (0.60 - $237.00) [*review of debtor's records; investigation of estate property*]

06/11/2013—Telephone conference with S. Sandler [i.e., jewelry appraiser] regarding inspection of personal property (0.10 - $39.50) [*investigation of estate property; communication with and supervision of estate professionals*]

06/12/2013—Telephone conference with D. Fillingame [i.e., Fred Haas Toyota representative] regarding title to truck, divorce issues, review of file regarding same (0.40 - $158.00) [*investigation of estate property*]

06/14/2013—Review of documents produced by E. Boutte [i.e., Debtor's ex-husband] (2.20 - $869.00) [*investigation of estate property*]

06/24/2013—Review of Western Surety dischargeability complaint (0.30 - $118.50) [*review of pleadings*]

07/08/2013—Review of appraisal reports (0.50 - $197.50) [*investigation of estate property*; *selling or disposing of assets*]

07/09/2013—Telephone conference with S. Sandler [i.e., jewelry appraiser] and J. Adair [i.e., artwork appraiser] regarding follow-up appraisal issues (0.20 - $79.00) [*investigation of estate property; selling or disposing of assets; communication with and supervision of estate professionals*]

09/09/2013—Review of file, emails with J. Koenig [i.e., counsel for E. Boutte] regarding meeting with E. Boutte (0.40 - $158.00) [*investigation of estate property; communication with creditors and other parties-in-interest*]

11/27/2013—Review of documents produced by Debtor (1.20 - $474.00) [*review of the debtor's records*]

12/09/2013—Review of receivership against E. Boutte [i.e., Debtor's ex-husband], email to N. Hamren [i.e., counsel for Western Surety] regarding same (0.40 - $158.00) [*review of pleadings; communication with creditors and other parties-in-interest*]

12/16/2013—Review of documents produced by Debtor (1.90 - $750.50) [*review of the debtor's records*]

08/07/2014—Telephone conference with N. Hamren [i.e., counsel for Western Surety] regarding appointment of receiver (0.30 - $118.50) [*communication with creditors and other parties-in-interest*]

08/08/2014—Review of divorce documents regarding potential assets for Boutte receiver (0.90 - $355.50) [*investigation of estate property; selling or disposing of assets*]

08/15/2014—Response to question from creditor regarding status of case (0.10 - $39.50) [*communication with creditors and other parties-in-interest*]

08/19/2014—Review of letter from E. Boutte [i.e., Debtor's ex-husband] regarding offer for assets, email to N. Hamren [i.e., counsel for Western Surety] regarding same (0.20 - $79.00) [*investigation of estate property; selling or disposing of assets; communication with creditors and other parties-in-interest*]

**09/03/2014—Telephone conference with J. Teal [i.e., divorce attorney for E. Boutte] regarding status of bankruptcy, review of matters regarding receivership, telephone conference with N. Hamren [i.e., counsel for Western Surety] regarding Boutte receivership (1.20 - $474.00)** [***communication with creditors and other parties-in-interest; review of pleadings***]

09/04/2014—Review of documents regarding Boutte assets (1.30 - $513.50) [*investigation of estate property; selling or disposing of assets*]

09/05/2014—Review of documents regarding Allen Boutte [i.e. E. Boutte's step-brother] assets (0.70 - $276.50) [*investigation of estate property; selling or disposing of assets*]

09/08/2014—Meeting with E. Engelhart [i.e., receiver for E. Boutte] and N. Hamren [i.e., counsel for Western Surety] regarding liquidation of assets (2.10 - $829.50) [*selling or disposing of assets; communication with creditors and other parties-in-interest*]

09/09/2014—Email to Eva Engelhart [i.e., receiver for E. Boutte] regarding Boutte assets (0.30 - $118.50) [*investigation of estate property; selling or disposing of assets; communication with creditors and other parties-in-interest*]

11/03/2014—Review of map records, public filings regarding identification of EAS Ranch (1.20 - $474.00) [*investigation of estate property*]

01/05/2015—Conference with S. Wilson regarding securing Flatonia property (0.40 - $158.00) [*non-legal services*; *investigation of estate property*]

01/13/2015—Email to E. Engelhart [i.e., receiver for E. Boutte], telephone conference with N. Hamren [i.e., counsel for Western Surety] regarding Flatonia property (0.20 - $79.00) [*communication with creditors and other parties-in-interest; investigation of estate property*]

01/20/2015—Review of letter to NFCU regarding Boutte purchase of house (0.30 - $118.50) [*non-legal services; investigation of estate property*]

01/26/2015—Conference with S. Wilson regarding inspection of Flatonia ranch, email to E. Engelhart [i.e., receiver for E. Boutte] regarding listing agreement (0.40 - $158.00) [*non-legal services; selling or disposing of assets; communication with creditors and other parties-in-interest*]

01/27/2015—Telephone conference with B. Ellis [i.e., potential buyer of ranch property] regarding interest in Flatonia property (0.20 - $79.00) [*non-legal services; selling or disposing of assets*]

**02/18/2015—Telephone conference with R. Smith [i.e., the real estate broker] regarding listing issues and review of file regarding same (0.70 - $276.50) [*non-legal services; selling or disposing of assets; communication with and supervision of estate professionals*]**

02/23/2015—Conference with JMH [i.e., the Trustee] regarding ranch furnishings, email to E. Engelhart [i.e., receiver for E. Boutte] regarding same (0.30 - $118.50) [*non-legal services; communication with creditors and other parties-in-interest; selling or disposing of assets*]

03/05/2015—review of documents and public records regarding interest in Allen Boutte [i.e. E. Boutte's step-brother] entities and transfers of property (3.70 - $1,461.50) [*investigation of estate property*]

03/06/2015—Continue review of records regarding Allen Boutte [i.e. E. Boutte's step-brother] properties (1.50 - $592.50) [*investigation of estate property*]

03/16/2015—Review of Allen Boutte [i.e. E. Boutte's step-brother] records (1.0 – $395.00) [*investigation of estate property*]

03/19/2015—Telephone conference with R. Smith [i.e., real estate broker] regarding offer for 25 acres and status of other offers (0.40 - $158.00) [*non-legal services; selling or disposing of assets; communication with and supervision of estate professionals*]

03/24/2015—Email with E. Engelhart [i.e., receiver for E. Boutte] regarding status of sale of Flatonia property (0.30 - $118.50) [*non-legal services; selling or disposing of assets; communication with creditors and parties-in-interest*]

04/01/2015—Review of All[e]n Boutte [i.e. E. Boutte's step-brother] documents and public records (2.0 - $790.00) [*investigation of estate property*]

**04/10/2015—Review of Allen Boutte [i.e. E. Boutte's step-brother] entity documents, email to N. Hamren [i.e., counsel for Western Surety] and E. Engelhart [i.e., receiver for E. Boutte]regarding same (2.0 - $790.00) [*investigation of estate property; communication with creditors and other parties-in-interest*]**

**04/13/2015—Telephone conference with attorney for Bea[u]mont regarding audit of HRE, review of file regarding same and production of bank records regarding same (0.80 - $316.00) [*investigation of estate property; communication with creditors and other parties-in-interest*]**

04/14/2015—Emails with D. Southerland [i.e., counsel for creditor of E. Boutte] regarding HRE bank records (0.20 - $79.00) [*communication with creditors and other parties-in-interest*]

04/17/2015—Respond to email from D. Southerland [i.e., counsel for creditor of E. Boutte] regarding Beaumont property (0.30 - $118.50) [*communication with creditors and other parties-in-interest*]

06/01/2015—Review of documentaiton [sic] on Allen Boutte [i.e. E. Boutte's step-brother] properties (2.10 - $829.50) [*investigation of estate property*]

06/08/2015—Telephone conference with R. Smith [i.e., real estate broker] regarding contract on sale of Flatonia property (0.40 - $158.00) [*non-legal services; communication with and supervision of estate professionals; selling or disposing of assets*]

06/11/2015—Telephone conference with R. Smith [i.e., real estate broker] regarding offer for sale of property, review of file regarding same (0.50 -

$197.50) [*non-legal services; communication with and supervision of estate professionals; selling or disposing of assets*]

06/12/2015—Review of tax records for Flatonia property, email to E. Engelhart [i.e., receiver for E. Boutte] regarding offer for property (0.50 - $197.50) [*non-legal services; selling or disposing of assets*]

06/23/2015—Emails with N. Hamren [i.e., counsel for Western Surety] regarding sale of ranch property and calculation of fees (0.30 - $118.50) [*non-legal services; communication with creditors and other parties-in-interest; selling or disposing of assets*]

06/23/2015—Telephone conference with N. Hamren [i.e., counsel for Western Surety] regarding status of Flatonia sale (0.20 - $79.00) [*non-legal services; communication with creditors and other parties-in-interest; selling or disposing of assets*]

07/02/2015—Telephone conference with R. Smith [i.e., real estate broker] regarding sale of Flatonia property and issues with property (0.50 - $197.50) [*non-legal services; communication with and supervision of estate professionals; selling or disposing of assets*]

**07/06/2015—Telephone conference with R. Smith [i.e., real estate broker], conference with R. Niehaus [i.e., real estate counsel for the Trustee], regarding terms of sale, conference with JMH [i.e., the Trustee] and email to E. Engelhart [i.e., receiver for E. Boutte] regarding sale of Flatonia property (0.80 - $316.00) [*communication with creditors and other parties-in-interest; communication with and supervision of estate professionals; selling or disposing of assets*]**

07/07/2015—Review of records regarding Acqui-Co properties (0.50 - $197.50) [*investigation of estate property*]

07/09/2015—Telephone conference with R. Smith [i.e., real estate broker] regarding contract for sale of property (0.20 - $79.00) [*non-legal services; communication with and supervision of estate professionals; selling or disposing of assets*]

07/13/2015—Meeting with John Kidd [i.e., potential buyer of ranch property] regarding offer to purchase ranch property (0.30 - $118.50) [*non-legal services; selling or disposing of assets*]

**07/13/2015—Review of documents for closing of Flatonia ranch, conference with R. Niehaus [i.e., real estate counsel for the Trustee] regarding issues and telephone conference with R. Smith [i.e., real estate broker] regarding additional offers (0.80 - $316.00) [*non-legal services; selling or disposing of assets*]**

07/14/2015—Conference with R. Niehaus [i.e., real estate counsel for the Trustee] and telephone conference with R. Smith [i.e., real estate broker] regarding minerals to be conveyed with property (0.40 - $158.00)

[*communication with and supervision of estate professionals; selling or disposing of assets*]

07/17/2015—Review of file and respond to request for description of ranch property (0.50 - $197.50) [*non-legal services; selling or disposing of assets*]

07/30/2015—Review of public records regarding value of Beaumont and Port Arthur properties (1.0 - $395.00) [*investigation of estate property*]

07/31/2015—Emails with R. Smith [i.e., real estate broker] regarding status of sale of property (0.30 - $118.50) [*non-legal services; communication with and supervision of estate professionals; selling or disposing of assets*]

**08/13/2015—Review of title report information, conference with R. Niehaus [i.e., real estate counsel for the Trustee] and emails with N. Hamren [i.e., counsel for Western Surety] and E. Engelhart [i.e., receiver for E. Boutte] regarding same (0.70 - $276.50) [*communication with creditors and other parties-in-interest; selling or disposing of assets*]**

08/17/2015—Review of order approving sale, conference with R. Niehaus [i.e., real estate counsel for the Trustee] regarding closing (0.20 - $79.00) [*review of pleadings; selling or disposing of assets*]

08/24/2015—Respond to email from D. Knabeshuh [i.e., attorney for First National Bank of Anderson] regarding closing on ranch property (0.20 - $79.00) [*non-legal services; communication with creditors and other parties-in-interest; selling or disposing of assets*]

08/24/2015—Conference with R. Niehaus [i.e., real estate counsel for the Trustee] and emails to parties regarding title requirements for closing (0.50 - $197.50) [*communication with creditors and other parties-in-interest; selling or disposing of assets*]

08/26/2015—Review of payoff info for Bank of Anderson, email to D. Knabeschuh [i.e., attorney for First National Bank of Anderson] regarding issues (0.20 - $79.00) [*non-legal services; communication with creditors and other parties-in-interest; selling or disposing of assets*]

08/27/2015—Review of payoff from Bank of Anderson on ranch sale, email to parties regarding same (0.20 - $79.00) [*non-legal services; communication with creditors and other parties-in-interest; selling or disposing of assets*]

09/28/2015—Review of files regarding Boutte assets (1.10 - $434.50) [*investigation of estate property*]

09/28/2015—Review of Eric Boutte [i.e., Debtor's ex-husband] motion to lift stay (0.30 - $118.50) [*review of pleadings*]

09/29/2015—Review of documents from Allen Boutte [i.e. E. Boutte's step-brother] (1.10 - $434.50) [*investigation of estate property*]

**11/02/2015—Work on claims (0.90 - $355.50) [*Claim review and evaluation*]**

As already noted, services falling into any of the nine categories identified in *Lexington* and *Howard Love* are presumptively not compensable. The Applicant in this case failed to provide sufficient, if any, testimony regarding the above-referenced time entries and how they involved "unique difficulties" beyond the Trustee's ability to resolve the problems himself; therefore, the Applicant has failed to overcome the presumption of non-compensability. Granted, Wentworth gave credible testimony that the sale of the Ranch required the real estate expertise of Ronald Niehaus ("Niehaus"), a partner at the Applicant, and this Court, as subsequently discussed, approves of the services rendered by Niehaus. [Hr'g Tr. 18:10−20:11, Jan. 28, 2016]. However, Wentworth's testimony failed to convince this Court that many of the services that he (i.e., Wentworth) rendered relating to the Ranch involved "unique difficulties" beyond the Trustee's ability to handle the matter himself. For example, Wentworth's July 31, 2015 time entry concerning "[e]mails with R. Smith regarding status of sale of property" and his August 27, 2015 time entry regarding "[r]eview of payoff from Bank of Anderson on ranch sale, email to parties regarding same" simply do not reflect any "unique difficulties" that the Trustee himself could not have handled himself. *See Knapp*, 930 F.2d at 388. The Trustee is, after all, a board-certified bankruptcy attorney who has been a trustee for 40 years. [Finding of Fact No. 2]. He certainly has the skills and experience to communicate with the estate's broker about the sale of the Ranch and to communicate with lienholders about the payment of their liens. Indeed, in the Second Amended Application to Employ, the Trustee represented to this Court that with respect to the sale of assets, he required the assistance of attorneys for only "non-routine" matters, [Doc. No. 86, pp. 4 & 8 of 14]; however, communications with the estate's real estate broker and with lienholders about payoff amounts are quintessentially routine matters. For all of

these reasons, the Court finds that all the time entries of Wentworth set forth above are disallowed.

The time entries related to Wentworth's services amount to 42.9 hours and $16,945.50 in billings.  This Court therefore disapproves the request for the sum of $16,945.50 because, due to the Applicant billing for services that the Trustee himself is obligated to provide under §§ 328(b) and 704(a), the Applicant is not entitled to the fees associated with these services.  To approve these fees would award a windfall to the Trustee and his law firm.

### c.  Services Rendered by Vianey Garza that are Disallowed

Vianey Garza ("Garza"), an associate attorney at the Applicant, made one time entry related to services that this Court finds falls within one of the specific categories that are presumptively non-compensable: "Work on reviewing documents produced by debtor." [Trustee's Ex. No. 1, p. 6 of 11].  Garza's time entry related to her services amounts to 1.20 hours and $180.00 in billings. This Court disapproves the request for the $180.00 because Garza's services fall within a presumptively non-compensable category—namely, "review of the debtor's records"—and no testimony was given to overcome this presumption.

All in all, the total amount of disallowed fees under the § 328(b) analysis is $20,708.50, representing the sum of the disallowed fees of $3,583.00 associated with Wilson's services, the disallowed fees of $16,945.50 associated with Wentworth's services, and the disallowed fees of $180.00 associated with Garza's services. Thus, the Court deducts the amount of $20,708.50 from the Applicant's total requested fee amount of $123,282.25—which leaves a balance of $102,573.75.

Having applied § 328(b) to the Fee Application, this Court must now apply § 330(a) to evaluate those services that have survived the § 328(b) analysis (i.e., the services valued at $102,573.75).

### E. Application of § 330(a) to the Fee Application

A court may award "reasonable compensation for actual, necessary services rendered" by a trustee's counsel and "reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1)(A)–(B). Section 330(a)(3) instructs courts, "[i]n determining the amount of reasonable compensation," to "take into account all relevant factors, including:"

> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
>
> (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
>
> (F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3). Furthermore, § 330(a)(4)(A) mandates that "the court *shall not* allow any compensation for—"

> (i)  Unnecessary duplication of services; or
> (ii) Services that were not—
>> (I)  Reasonably likely to benefit the debtor's estate; or
>> (II) Necessary to the administration of the case.

11 U.S.C. § 330(a)(4)(A).

The leading Fifth Circuit decision regarding § 330 is *Woerner*, 783 F.3d 266 (5th Cir. 2015). In *Woerner*, the Fifth Circuit joined the majority of circuits in adopting a prospective test for determining whether professional services are compensable, as suggested by the third factor that courts must consider under § 330: "[W]hether the services were necessary . . . or beneficial *at the time at which the service was rendered*." *Id.* at 268, 273–74 (emphasis added). Additionally, the Fifth Circuit provided the following list of factors that bankruptcy courts "ordinarily consider" when weighing this factor:

> [T]he probability of success at the time the services were rendered, the reasonable costs of pursuing the action, what services a reasonable lawyer or legal firm would have performed in the same circumstances, whether the attorney's services could have been rendered by the Trustee and his or her staff, and any potential benefits to the estate (rather than to the individual debtor).

*Id.* at 276.

*Woerner* reversed the Fifth Circuit's prior retrospective test, under which professionals could only be compensated for services that *actually* resulted in a tangible, identifiable, and material benefit to the estate. *See In re Pro-Snax Distributors, Inc.*, 157 F.3d 414, 426 (5th Cir. 1998). Instead, under the new, prospective test, "[w]hether the services were ultimately successful is relevant to, *but not dispositive of*, attorney compensation." *Woerner*, 783 F.3d at 276 (emphasis added). In sum, the Fifth Circuit held that when read in its entirety, § 330 "permits a court to compensate an attorney not only for activities that were 'necessary,' but also for **good gambles**—that is, services that were objectively reasonable at the time they were made—even when those gambles do not subsequently (or eventually) produce an 'identifiable, tangible, and material benefit.' " *Id.* at 273–74 (emphasis added). If professional services were *either* " 'necessary to the administration' of a bankruptcy case or 'reasonably likely to benefit' the bankruptcy estate 'at the time at which [they were] rendered,' *see* 11 U.S.C. § 330(a)(3)(C),

(4)(A), then the services are compensable."[11]  *Id.* at 276.  However, the Fifth Circuit emphasized

that its *Woerner* ruling "is not intended to limit courts' broad discretion to award or curtail

attorney's fees under § 330, 'taking into account *all* relevant factors.'"  *Id.* at 277 (quoting § 330)

(emphasis added).

While *Woerner* overturned *Pro-Snax*, it did not disturb the lodestar approach used in

assessing fee applications. Indeed, courts within the Fifth Circuit have ordinarily used the

lodestar method to calculate the amount of reasonable attorneys' fees.  *In re Cahill*, 428 F.3d

536, 539–40 (5th Cir. 2005) (citation omitted).   Under the lodestar method, a court first

calculates the compensable hours billed, and then calculates a reasonable hourly rate for the

compensable services.  *Id.* at 540.  The court arrives at the final amount of compensable fees by

multiplying the two resulting figures.  *Id.*  The Supreme Court has emphasized the importance of

the lodestar approach in calculating the reasonableness of attorneys' fees, noting that because the

method is readily administrable and objective, it "cabins the discretion of trial judges, permits

meaningful judicial review, and produces reasonably predictable results."  *Perdue v. Kenny*, 559

U.S. 542, 552 (2010).

Further, this Court, after determining the lodestar fee, may consider, in its discretion,

whether the resulting lodestar amount should be adjusted upward or downward to account for

factors not considered during the lodestar calculation.  *In re Pilgrim's Pride Corp.*, 690 F.3d 650,

655 (5th Cir. 2012).  In assessing whether an adjustment is appropriate, the Court may consider,

among other factors, the twelve factors articulated in *Johnson v. Georgia Highway Exp., Inc.*,

488 F.2d 714 (5th Cir. 1974). These factors are: "(1) The time and labor required; (2) The

novelty and difficulty of the questions; (3) The skill requisite to perform the legal service

---

[11] Hereinafter, in this Opinion, when this Court uses the word "necessary," it will usually be shorthand for "necessary to the administration of this Chapter 7 case." Further, when this Court uses the word "reasonable," it will usually be shorthand for "reasonably likely to benefit this Chapter 7 estate at the time the services were rendered."

properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or other circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; (12) Awards in similar cases." *Id.* at 718.   Aside from the twelve *Johnson* factors, the Court may also "consider all relevant factors" in making any adjustment to the lodestar fee.  *Woerner*, 783 F.3d at 277.

Finally, for any fees requested under § 330(a), "[t]he applicant bears the burden of proof in a fee application case."  *Matter of Evangeline Refining Co.*, 890 F.2d 1312, 1326 (5th Cir. 1989).

1. Step No. 1 under the Lodestar Approach: Determining Whether all the Hours Billed by the Applicant are Compensable

The first step in the lodestar method is to evaluate the time entries submitted by the Applicant and determine which are allowable.  This step involves considering whether the services which the Applicant billed were reasonable or necessary.  Because of the prominence of this factor in § 330(a) and in *Woerner*, the Court weighs this factor most heavily.

a. **Whether the Services Rendered by the Applicant Were Reasonable or Necessary?**

This Court has carefully reviewed the timesheets attached to the Fee Application.  Having identified the legal services for which the Applicant wants to charge the estate, the Court will now address whether these services were either reasonable or necessary with regard to this Chapter 7 case.

*i.  The Applicant's Timesheets Contain Vague Time Entries that Lead this Court to Disallow the Fees Associated with These Entries*

Time entries that do not provide sufficient detail to determine whether the services described are compensable may be disallowed due to vagueness.  *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995).  The Court finds that several of the entries in the Fee Application are vague, preventing this Court from determining whether the services were either reasonable or necessary.  Stated differently, the Court cannot divine what the details are about the communications that were made; the Applicant has the burden of educating this Court about this information, and the Applicant has failed to do so.   *Evangeline*, 890 F.2d at 1326 (explaining that "[t]he applicant bears the burden of proof in a fee application case . . . [and that] [t]he reviewing court should not venture guesses nor undertake extensive investigation to justify a fee for an attorney [] who has not done so himself.").

The Court finds that the following eight time entries are vague and therefore are not compensable:

**Time Entry #1:**

| Date | Hours Billed | Amount | Description |
|---|---|---|---|
| 05/08/2013 | 0.50 | $197.50 | Review of emails regarding production of documents by Debtor, research and respond to same |

With regard to the 05/08/2013 time entry—which was entered by Wentworth—without further information identifying the "production of documents" and the "research [] to same" at issue, this Court cannot determine if these services are reasonable or necessary.  [Trustee's Ex. No. 1, p. 2 of 11].  Indeed, to merit compensation for time spent on an email, a professional must "identify the participants, describe the substance of the communication, explain its outcome and justify its necessity."  *In re Fibermark, Inc.*, 349 B.R. 385, 396 (Bankr. D. Vt. 2006).  Here, Wentworth has failed to do so.

46

**Time Entry #2:**

| Date | Hours Billed | Amount | Description |
|------|--------------|--------|-------------|
| 05/17/2013 | 0.90 | $355.50 | Meeting with Eric Boutte |

With regard to the 05/17/2013 time entry, this Court cannot determine if this particular service is reasonable or necessary because Wentworth fails to set forth what the specific subject of his meeting with Eric Boutte [i.e., Debtor's ex-husband] was about. [Trustee's Ex. No. 1, p. 5 of 11]. *See In re Wildman*, 72 B.R. 700, 708 (Bankr. N.D. Ill. 1987) ("[A]n entry of 'conference' or 'meeting,' 'conference with X' or 'conversation with X' is insufficient. The entry should at the very least note the nature and purpose of the various meetings and conferences as well as the parties involved.").

**Time Entry #3:**

| Date | Hours Billed | Amount | Description |
|------|--------------|--------|-------------|
| 01/16/2014 | 0.20 | $79.00 | Emails with E. Boutte regarding evidence issues |

With regard to the 01/16/2014 time entry by Wentworth, without further information identifying what the "evidence issues" concerned, this Court cannot determine if these services are reasonable or necessary.  [Trustee's Ex. No. 1, p. 3 of 11].  Once again, to merit compensation for time spent on an email, a professional must "identify the participants, describe the substance of the communication, explain its outcome and justify its necessity." *Fibermark*, 349 B.R. at 396.  Here, Wentworth has failed to do so.

**Time Entry #4:**

| Date | Hours Billed | Amount | Description |
|------|--------------|--------|-------------|
| 01/16/2014 | 0.20 | $79.00 | Review of file regarding same |

With regard to this particular time entry on 01/16/2014 by Wentworth, without further information identifying what exactly he reviewed and for what purpose, this Court cannot determine if these services are reasonable or necessary.  [Trustee's Ex. No. 1, p. 3 of 11].

**Time Entry #5:**

| Date | Hours Billed | Amount | Description |
|------|--------------|--------|-------------|
| 01/16/2014 | 1.70 | $671.50 | Work on discharge case |

With regard to this particular time entry on 01/16/2014 by Wentworth, without further information identifying what exactly he worked on with regard to this "discharge case," this Court cannot determine if these services are reasonable or necessary. [Trustee's Ex. No. 1, p. 3 of 11]. Indeed, at the hearing on the Fee Application, when Western Surety's attorney asked Wentworth what specific services he provided with respect to this time entry, Wentworth responded as follows: "I don't have any independent recollection of what I did. I'm sure I was reviewing documents perhaps, putting together discovery perhaps. I don't know." [Hr'g Tr. 30:24−31:1, Jan. 28, 2016]. His response underscores that this entry is too vague to merit compensation.

**Time Entry #6:**

| Date | Hours Billed | Amount | Description |
|------|--------------|--------|-------------|
| 09/08/2014 | 1.70 | $671.50 | Review of file regarding same |

Similar to Time Entry #4 that is referenced above, without further information identifying what exactly was reviewed and for what purpose, this Court cannot determine if these services billed on September 8, 2014 by Wentworth are reasonable or necessary. [Trustee's Ex. No. 1, p. 3 of 11]. This particular entry is the last entry in the subsection of the timesheets regarding the Objection to Discharge. Given that this Court issued an order sustaining the Objection to Discharge on July 2, 2014, [Finding of Fact No. 10], it is particularly disconcerting that Wentworth, more than two months later, is billing the estate $671.50 for apparently reviewing the file about a matter that has already been resolved. Indeed, the Court wonders just how much time the Trustee reviewed the Applicant's timesheets prior to the filing of the Fee Application.

How can the Trustee justify allowing $671.50 to be billed to the estate for Wentworth's review of a matter that has already been completely adjudicated and were no appeal was taken?

**Time Entry #7:**

| Date | Hours Billed | Amount | Description |
|------|-------------|--------|-------------|
| 07/16/2015 | 0.40 | $160.00 | Telephone conference with Randy Smith; review of email from R. Scheurer re bidding procedures; review of bid from the Raabes. |

With regard to the 07/16/2015 time entry of Niehaus, this Court cannot determine whether the service of "telephone conference with Randy Smith" is reasonable or necessary because Niehaus fails to set forth the subject or purpose of his conference with Randy Smith. [Trustee's Ex. No. 1, p. 7 of 11]. *See Wildman*, 72 B.R. at 708 ("An entry of 'telephone call' or even 'telephone call with Mrs. X' is insufficient . . . The purpose and length of the conversations, and the person called or calling, must be clearly set out.").

**Time Entry #8:**

| Date | Hours Billed | Amount | Description |
|------|-------------|--------|-------------|
| 11/02/2015 | 0.90 | $355.50 | Work on claims |

With regard to the 11/02/2015 time entry of Wentworth, without further information identifying what "claims" are at issue and what type of "work" that occurred, this Court cannot determine if these services are reasonable or necessary. [Trustee's Ex. No. 1, p. 11 of 11].

The Applicant failed to provide any testimony at the hearing on the Fee Application about the above-referenced eight time entries that would assist this Court in determining whether the services were reasonable or necessary. For example, with respect to Time Entry #8, if Wentworth had testified about just exactly what his "work on claims" involved—Was he analyzing causes of actions that the estate might have against some third party, or was he reviewing documentation attached to proofs of claim to determine whether objections should be lodged to these claims?—then this Court might well be able to determine that his services were

49

reasonable or necessary.  Unfortunately for the Applicant, no such testimony was adduced. *See, e.g.*, *In re Advanced Microbial Solutions, L.L.C.*, 306 B.R. 915, 920 (E.D. Tex. 2004) ("Surprisingly, although witnesses were listed . . . no testimony . . . was presented to the bankruptcy court . . . [p]resentation of such evidence in the form of an affidavit or live testimony is fundamental in presenting an attorney's fee application to a court."); *In re First State Bancorporation*, 2014 WL 1203141, *37 (Bankr. D.N.M. Mar. 24, 2014) ("[The law firm] presented no testimony in support of the [its] Fee Application, instead choosing to rely solely on the [law firm's] Fee Application itself to establish the reasonableness and necessity of its requested compensation. Absent evidence . . . the Court finds that a portion of the requested fees must be disallowed.").  Thus, the Applicant has failed to meet its burden of establishing that the services listed in the eight time entries set forth above were either reasonable or necessary. *Evangeline*, 890 F.2d at 1326 ("The applicant bears the burden of proof in a fee application case.").

In total, the Court excludes 6.5 hours, amounting to $2,569.50 in billings, for vague entries.

### ii.   *The Applicant's Timesheets Contain Lumped Time Entries that Lead this Court to Disallow the Fees Associated with These Entries*

In addition to vague entries, the Fee Application contains several time entries that lump together multiple services without providing the time spent on each discrete task.  Like vague entries, lumped entries prevent a court from accurately determining how many hours were reasonably billed.  *See In re 900 Corp.*, 327 B.R. 585, 598 (Bankr. N.D. Tex. 2005) ("When time entries are vague or lumped together, such that the Court cannot determine how much time was spent on particular services, then the Applicant has not met its burden to show that its fees are reasonable."); *In re Saunders*, 124 B.R. 234, 237 n. 1 (Bankr. W.D. Tex. 1991) ("In order for the

court to determine whether time spent on an activity was reasonable, multiple services cannot be 'lumped' together under one time entry.").  Indeed, lumping activities on fee statements violates the U.S. Trustee's Fee Guidelines,[12] and this Court has repeatedly made it known in prior opinions over the past several years that it adheres to these Guidelines and expects the practicing bar to follow them.  *See, e.g.*, *In re Digerati Technologies, Inc.*, 537 B.R. 317 (Bankr. S.D. Tex. 2015); *In re Ritchey*, 512 B.R. 847, 870–72 (Bankr. S.D. Tex. 2014); *In re Jack Kline Co., Inc.*, 440 B.R. 712, 752–53 (Bankr. S.D. Tex. 2010); *In re Energy Partners, Ltd.*, 422 B.R. 68, 89 (Bankr. S.D. Tex. 2009).

At least 54 time entries in the Fee Application contain "lumped" activities.  For example, on May 24, 2013, Wentworth billed 2.30 hours for performing four separate tasks: "Review of documents produced by Debtor, preparation of orders requested by court on protective order and turnover, email to parties and E. Boutte regarding production of documents."  [Trustee's Ex. No. 1, p. 2 of 11].  What Wentworth should have done was to record the amount of time he spent *on each of these discrete tasks* so that this Court could assess whether the time spent on each task was reasonable.  As another example, on June 3, 2014, Wentworth billed 2.20 hours for five discrete services: "Preparation of joint pretrial statement, findings of fact, conclusions of law, emails with M. Knox regarding [] changes to same, review of file regarding trial issues." [Trustee's Ex. No. 1, p. 3 of 11].  Once again, this Court reiterates that Wentworth needed to break out his time on each of the above-described discrete tasks for this Court to assess

---

[12] U.S. DEP'T OF JUSTICE, *Guidelines for Reviewing Applications for Compensation (Fee Guidelines)*, JUSTICE.GOV (Feb. 24, 2016 10:39 AM), http://www.justice.gov/ust/fee-guidelines.  The U.S. Trustee Guidelines expressly state that:

> Time entries should be kept contemporaneously with the services rendered in time periods of tenths of an hour.  Services should be noted in detail and not combined or "lumped" together, with each service showing a separate time entry; however, tasks performed in a project which total a <u>de minimis</u> amount of time can be combined or lumped together if they do not exceed .5 hours on a daily aggregate.

reasonableness.   His failure to do so results in this Court completely disallowing the fees associated with these entries.

The Court finds the Applicant's lumping particularly egregious considering that Wentworth is an extremely experienced bankruptcy attorney who, having first served as a law clerk to a bankruptcy judge and then practiced for approximately 28 years, should have known that lumping violates the U.S. Trustee's Fee Guidelines.   He is—or should be—familiar with this Court's stance on lumping.   *See Ritchey*, 512 B.R. at 872 (holding an experienced bankruptcy professional to a higher standard).   Indeed, Wentworth knows how to bill his time correctly—i.e., break out the time spent on each discrete task—because he actually did so in several instances, as evidenced by the timesheet themselves.   [*See, e.g.*, Trustee's Ex. No. 1, p. 2 of 11]. Set forth below are two examples of Wentworth's time entries indicating that he knows full well how to comply with the U.S. Trustee Guidelines about lumping:

> 05/09/2013 – Exchange emails with L. Greene regarding production of documents (.30); telephone conference with E. Boutte regarding production of documents (.20); review of file regarding same (.20)

> 06/20/2013 – Review of financial records (1.50); continue preparation of objection to discharge (2.2); telephone conference with J. Waler regarding HRE financial records (.30); emails with E. Boutte regarding same (.50).

[Trustee's Ex. No. 1, p. 2 of 11].

In sum, the Applicant's lumped entries in the Fee Application amount to 84 hours and $33,180.00 in billings.   This Court will deduct these time entries because, due to the lumping, the Applicant has not met its burden of proving that the services described therein were reasonable or necessary.   The Court deducts the value of these entries in its entirety because all of these services were rendered and billed well after this Court issued its *Energy Partners* opinion in 2009 and its *Jack Kline* opinion in 2010 putting the bar on notice that this Court enforces the

U.S. Trustee Guidelines on lumping. *See Energy Partners*, 422 B.R. at 89−90; *Jack Kline*, 440

B.R. at 752−53. Indeed, this Court, in a fee application dispute from 2015, has already

disallowed lumped entries in their entirety, *see Digerati*, 537 B.R. at 334, and there is no good

reason why the Court should not take this same approach here. The following chart sets forth all

of the lumped entries entered by Wentworth for which all compensation is denied:[13]

| Transaction Date | Attorney | Rate | Hours | Amount | Description |
|---|---|---|---|---|---|
| 03/18/2013 | TLW | $395.00 | 1.60 | $632.00 | Meeting with E. Boutte [i.e., Debtor's ex-husband] and JMH [i.e., the Trustee] regarding claims and possible missing assets, review of file regarding same |
| 03/19/2013 | TLW | $395.00 | 1.20 | $474.00 | Review of file, preparation of motion to extend deadline to object to exemptions |
| 04/10/2013 | TLW | $395.00 | 0.70 | $276.50 | Review of documents provided by Debtor, email to L. Greene [i.e., Debtor's counsel] regarding additional documents needed |
| 04/17/2013 | TLW | $395.00 | 0.60 | $237.00 | Review of information on personal property appraisal from J. Adair [i.e., artwork appraiser], telephone conference with S. Sandler regarding jewelry appraisal |
| 05/06/2013 | TLW | $395.00 | 0.60 | $237.00 | Review of documents regarding valuation of EAS Development, email to E. Boutte [i.e., Debtor's ex-husband] regarding further documentation |
| 05/13/2013 | TLW | $395.00 | 1.80 | $711.00 | Research and preparation of objection to motion for protection |
| 05/13/2013 | TLW | $395.00 | 1.00 | $395.00 | Review of documentation regarding insurance policies and potential objection to exemption, research regarding same |
| 05/24/2013 | TLW | $395.00 | 2.30 | $908.50 | Review of documents produced by Debtor, preparation of orders requested by court on protective order and turnover, email to parties and E. Boutte [i.e., Debtor's ex-husband] regarding production of documents |
| 06/04/2013 | TLW | $395.00 | 1.30 | $513.50 | Review of further documents regarding potential assets, objection to discharge |
| 06/13/2013 | TLW | $395.00 | 5.20 | $2,054.00 | Review of documents, preparation of complaint objecting to discharge |
| 08/12/2013 | TLW | $395.00 | 1.00 | $395.00 | Preparation for objection to exemption hearing, telephone conference with J. Walker regarding HRE records |
| 08/26/2013 | TLW | $395.00 | 1.00 | $395.00 | Review of request for production of documents and begin preparation of response |
| 09/12/2013 | TLW | $395.00 | 2.90 | $1,145.50 | Investigate bank accounts, preparation of subpoenas and letters to various bank requesting records |
| 09/20/2013 | TLW | $395.00 | 1.20 | $474.00 | Emails with J. Koenig [i..e, counsel for E. Boutte] regarding consent of HRE to obtain bank records, preparation of affidavits for Eric Boutte's [i.e., Debtor's ex-husband] signature SendEvent to Texas Community |
| 10/10/2013 | TLW | $395.00 | 1.40 | $553.00 | Continue preparation for hearing on objection to exemption, telephone conference with E. Boutte regarding same and Acqui-Co distribution, email to R. Sommers [i.e., counsel for Debtor's ex-husband] regarding same |
| 10/17/2013 | TLW | $395.00 | 1.20 | $474.00 | Telephone conference with L. Greene [i.e., Debtor's counsel] regarding objection to exemption, review of file, email to L. Greene regarding issues on insurance policies |

[13] The Court has identified in brackets any individuals referred to in the timesheets.

| 10/22/2013 | TLW | $395.00 | 5.10 | $2,014.50 | Preparation for hearing on objection to exemption, meeting with E. Boutte [i.e., Debtor's ex-husband] regarding same |
|---|---|---|---|---|---|
| 11/06/2013 | TLW | $395.00 | 2.30 | $908.50 | Conference with E. Boutte [i.e., Debtor's ex-husband], review of documents produced by J. Teal [i.e., divorce attorney for E. Boutte] in preparation for objection to exemption hearing |
| 12/19/2013 | TLW | $395.00 | 0.60 | $237.00 | Review of claims, conference with JMH [i.e., the Trustee] regarding settlement terms |
| 01/20/2014 | TLW | $395.00 | 0.60 | $237.00 | Review of file regarding same, research regarding subordination |
| 02/10/2014 | TLW | $395.00 | 1.10 | $434.50 | Review of documents, preparation for deposition, emails with L. Greene [i.e., Debtor's counsel] regarding settlement meeting |
| 04/15/2014 | TLW | $395.00 | 2.70 | $1,066.50 | Preparation for and attendance at meeting with Liza Greene [i.e., Debtor's counsel] |
| 05/12/2014 | TLW | $395.00 | 0.70 | $276.50 | Review of file regarding settlement issues, conference with JMH [i.e., the Trustee] regarding same, email to L. Greene [i.e., Debtor's counsel] regarding settlement proposal |
| 05/21/2014 | TLW | $395.00 | 1.40 | $553.00 | Review of documentation from B. Jackson [i.e., potential purchaser of the ranch] regarding interest in minerals, status of EAS entity, email to N. Hamren [i.e., counsel for Western Surety] regarding same |
| 05/29/2014 | TLW | $395.00 | 3.90 | $1,540.50 | Review of documents in preparation for trial and preparation of pretrial statement |
| 06/03/2014 | TLW | $395.00 | 2.20 | $869.00 | Preparation of joint pretrial statement, findings of fact, conclusions of law, emails with M. Knox [i.e., counsel for the Debtor] regarding [] changes to same, review of file regarding trial issues |
| 06/05/2014 | TLW | $395.00 | 4.70 | $1,856.50 | Preparation for trial, attendance at pretrial conference |
| 07/03/2014 | TLW | $395.00 | 1.00 | $395.00 | Review of opinion, review of file regarding next steps, emails with N. Hamren [i.e., counsel for Western Surety] regarding same and status of receivership, email to E. Boutte [i.e., Debtor's ex-husband] regarding m[i]ssing artwork |
| 09/03/2014 | TLW | $395.00 | 1.20 | $474.00 | Telephone conference with J. Teal [i.e., divorce attorney for E. Boutte] regarding status of bankruptcy, review of matters regarding receivership, telephone conference with N. Hamren [i.e., counsel for Western Surety] regarding Boutte receivership |
| 09/05/2014 | TLW | $395.00 | 0.70 | $276.50 | Review of public records regarding EAS property, email to B. Jackson [i.e., potential purchaser of the ranch] regarding issues with property description |
| 09/10/2014 | TLW | $395.00 | 0.60 | $237.00 | Review of documents regarding title and mineral issues with EAS property, emails to N. Hamren [i.e., counsel for Western Surety] and E. Engelhart [i.e, receiver for E. Boutte] regarding same |
| 09/23/2014 | TLW | $395.00 | 0.60 | $237.00 | Telephone conference with N. Hamren [i.e., counsel for Western Surety], emails with D. Knabeschuh [i.e., counsel for First National Bank of Anderson] regarding lien and value on Flatonia property |
| 09/24/2014 | TLW | $395.00 | 0.60 | $237.00 | Review of documentation and emails regarding EAS Flatonia ranch, liens and value |
| 10/16/2014 | TLW | $395.00 | 4.00 | $1,580.00 | Preparation for and attendance at Eric Boutte [i.e., Debtor's ex-husband] examination, conference with N. Hamren [i.e., counsel for Western Surety] and E. Engelhart [i.e., receiver for E. Boutte] regarding same |
| 10/23/2014 | TLW | $395.00 | 1.20 | $474.00 | Telephone conference with R. Smith [i.e., real estate broker] regarding review of information on EAS ranch property, email to R. Smith regarding same, review of public records regarding identity and value of property |
| 12/02/2014 | TLW | $395.00 | 1.00 | $395.00 | Telephone conference with R. Smith [i.e., real estate |

| | | | | | broker] regarding value of Flatonia ranch, review of records regarding same, email to E. Engelhart [i.e., receiver for E. Boutte] and N. Hamren [i.e., counsel for Western Surety] regarding sale of ranch |
|---|---|---|---|---|---|
| 01/13/2015 | TLW | $395.00 | 1.50 | $592.50 | Review of Allen Boutte documents, conference with S. Wilson regarding evaluation of same and determination of potential causes of action |
| 01/29/2015 | TLW | $395.00 | 0.60 | $237.00 | Review of documents and telephone conference with R. Smith [i.e., real estate broker] regarding minerals and effect on asking price, conference with R. Niehaus [i.e., real estate counsel for the Trustee] regarding same |
| 02/18/2015 | TLW | $395.00 | 0.70 | $276.50 | Telephone conference with R. Smith regarding listing issues and review of file regarding same |
| 04/10/2015 | TLW | $395.00 | 2.00 | $790.00 | Review of Allen Boutte entity documents, email to N. Hamren [i.e., counsel for Western Surety] and E. Engelhart [i.e., receiver for E. Boutte] regarding same |
| 04/13/2015 | TLW | $395.00 | 0.80 | $316.00 | Telephone conference with attorney for Beamont regarding audit of HRE, review of file regarding same and production of bank records regarding same |
| 06/04/2015 | TLW | $395.00 | 2.60 | $1,027.00 | Preparation for deposition of Allen Boutte [i.e., E. Boutte's step-brother], review of documents |
| 06/10/2015 | TLW | $395.00 | 1.60 | $632.00 | Review of documents produced by A. Boutte [i.e., E. Boutte's step-brother], review public records regarding same |
| 06/29/2015 | TLW | $395.00 | 1.00 | $395.00 | Telephone conference with R. Sommers [i.e., counsel for Debtor's ex-husband] regarding documents needed from A. Boutte [i.e., E. Boutte's step-brother], review of file regarding same |
| 07/01/2015 | TLW | $395.00 | 0.90 | $355.50 | Preparation of motion to extend stay regarding Flatonia ranch, email to D. Knabeschuh [i.e., counsel for First National Bank of Anderson] regarding same |
| 07/06/2015 | TLW | $395.00 | 0.80 | $316.00 | Telephone conference with R. Smith [i.e., real estate broker], conference with R. Niehaus [i.e., real estate counsel for the Trustee] regarding terms of sale, conference with JMH [i.e., the Trustee] and email to E. Engelhart [i.e., receiver for E. Boutte] regarding sale of Flatonia property |
| 07/13/2015 | TLW | $395.00 | 2.20 | $869.00 | Telephone conference with R. Sommers [i.e., counsel for Debtor's ex-husband] regarding status of Allen Boutte Beaumont property, research regarding title issues and claims of AB Revocable Trust |
| 07/13/2015 | TLW | $395.00 | 0.80 | $316.00 | Review of documents for closing of Flatonia ranch, conference with R. Niehaus [i.e., real estate counsel for the Trustee] regarding issues and telephone conference with R. Smith [i.e., real estate broker] regarding additional offers |
| 07/20/2015 | TLW | $395.00 | 2.50 | $987.50 | Conference with R. Niehaus [i.e., real estate counsel for the Trustee] regarding bids on property, review of final contract, email to E. Engelhart [i.e., receiver for E. Boutte] regarding same, preparation and filing of motion to sell |
| 07/29/2015 | TLW | $395.00 | 0.70 | $276.50 | Review of file and email to R. Sommers [i.e., counsel for Debtor's ex-husband] regarding information needed on Allen Boutte [i.e., E. Boutte's step-brother] properties |
| 07/29/2015 | TLW | $395.00 | 1.30 | $513.50 | Conference with JMH [i.e., the Trustee] regarding Allen Boutte [i.e., E. Boutte's step-brother] issues, review of file, email to R. Sommers [i.e., counsel for Debtor's ex-husband] regarding additional information needed |
| 08/13/2015 | TLW | $395.00 | 0.70 | $276.50 | Review of title report information, conference with R. Niehaus [i.e., real estate counsel for the Trustee] and emails with N. Hamren [i.e., counsel for Western Surety] and E. Engelhart [i.e., receiver for E. Boutte] regarding same |

| 09/25/2015 | TLW | $395.00 | 1.20 | $474.00 | Review of documents regarding potential Allen Boutte [i.e., E. Boutte's step-brother] causes of action, email to R. Sommers regarding response to request for documents |
| 10/13/2015 | TLW | $395.00 | 0.90 | $355.50 | Review of file regarding potential Boutte claims, telephone conference with R. Sommers [i.e., counsel for Debtor's ex-husband] regarding claims against Allen Boutte |

[Trustee's Ex. No. 1].

### iii. Analysis as to Whether Those Services That are Not Vague and That are Not Lumped Were Reasonable and Necessary

Having now excluded vague entries and lumped entries, this Court now reviews the remaining entries to determine if the legal services described therein are reasonable and necessary.

#### (1) Were the Services Rendered Relating to the Objection to Discharge Reasonable and Necessary?

The biggest bone of contention is the Trustee's prosecution of the Objection to Discharge. Western Surety argues that the services rendered by the Applicant in prosecuting the Objection to Discharge were neither reasonable nor necessary. Specifically, Western Surety contends that once it requested the Trustee to cease prosecuting the Objection to Discharge, the Trustee should have done so. Western Surety bases its argument on both the facts and the law. First, Western Surety points out that it is the largest creditor by an overwhelming amount and percentage. [*See* Findings of Fact Nos. 20 & 21]. Second, it has been the only active creditor in this case. Third, it took it upon itself to file a complaint to determine dischargeability against the Debtor, and it obtained an agreed final judgment from the Debtor for a non-dischargeable debt of $200,000.00. [Findings of Fact Nos. 18 & 19]. Under these circumstances, Western Surety contends that once it requested the Trustee to dismiss its Objection to Discharge, the Trustee should have done so because it was not "advisable" to go forward.

Western Surety points to § 704(a)(6) in support of its position. As already discussed, § 704(a) describes the twelve different categories of duties that a Chapter 7 trustee must fulfill.

The sixth enumerated duty is that the "trustee shall—**if advisable**, oppose the discharge of the debtor."  11 U.S.C. § 704(a)(6) (emphasis added).  According to Western Surety, the phrase "if advisable" means that under certain circumstances, a trustee should ***not*** seek to prevent a debtor's discharge.  Here, Western Surety contends, such circumstances exist.  As the largest and only active creditor in this case that was prosecuting its own complaint to determine dischargeability,  Western Surety believes it was entirely justified in requesting the Trustee to dismiss the Objection to Discharge in order for the estate to avoid the substantial fees that it would incur by having the Applicant prosecute this suit.  Stated differently, Western Surety believed that it was not "advisable" for the Trustee to prosecute the Objection to Discharge so that there would be more funds available for distribution to unsecured creditors, the largest of whom is Western Surety, which holds 99.24% of all of the unsecured debt.  [Finding of Fact No. 21].

        For its part, the Applicant strongly disagrees that prosecuting the Objection to Discharge was not "advisable."   First, the Applicant contends that once it initiated the Objection to Discharge, the Trustee could not withdraw the suit, as demanded by Western Surety.   The Applicant points to Rule 7041 and applicable case law holding that a plaintiff who has initiated an objection to discharge may not unilaterally dismiss this suit. [Doc. No. 145, 1−3¶3−5]; *In re Kallstrom*, 298 B.R. 753, 758 (B.A.P. 10th Cir. 2003); *In re Levine*, 287 B.R. 683, 692 (Bankr. E.D. Mich. 2002).  The Applicant emphasizes that the Advisory Committee Note for Rule 7041 reads as follows: "Dismissal of a complaint objecting to a discharge raises special concerns because the plaintiff may have been induced to dismiss by an advantage given or promised by the debtor or someone acting in his interest."  Indeed, the Applicant contends that the Debtor's lack of cooperation with the Trustee from the outset of this case made the prosecution of the

Objection very "advisable."   How else, argues the Applicant, could the integrity of the bankruptcy system be vindicated except for preventing the discharge of a non-cooperative debtor?   [*See* Hr'g Tr. 41:8−42:4, Jan. 28, 2016].   Moreover, the Applicant asserts that the Trustee owes a duty to **all** of the unsecured creditors, not just Western Surety, and that the Trustee would have violated this duty if the Applicant had not prosecuted the Objection to Discharge on his behalf.   Indeed, the Applicant contends that by obtaining a judgment of no discharge, it benefited all unsecured creditors, including Western Surety.   The Applicant notes that all of these creditors can now seek to collect their debts at any future time, a right which would have been extinguished if the Trustee had dismissed the Objection, thereby allowing the Debtor to receive her general discharge.[14]

For Western Surety, this is a pyrrhic victory because: (1) it has already obtained an agreed judgment barring the Debtor's discharge for $200,000.00 of the $2,729,777.53 claim held by Western Surety; (2) all of the other creditors hold debts that, because they are quite small, will inevitably mean that they will never spend a dime attempting to collect these debts in the future; and (3) the attorneys' fees by the Trustee in prosecuting the Objection to Discharge were excessive, thereby unreasonably reducing the already small amount of estate funds to be distributed to the unsecured creditors.

---

[14] With one exception, the Applicant is correct in stating that all unsecured creditors can pursue the Debtor in the future to collect the pre-petition debts that she owes to them.  The one exception is Western Surety.  It cannot seek to collect the $2,729,777.53 claim that it filed in this case against the Debtor in the future because Western Surety and the Debtor entered into an agreed judgment that only $200,000.00 of this claim would be non-dischargeable. [Finding of Fact No. 19].  But, Western Surety entered into this agreed judgment more than three months *after* this Court sustained the Trustee's Objection to Discharge, so Western Surety knew at this time that it had the right to pursue the Debtor in the future for the entire $2,729,777.53.  Thus, Western Surety did benefit from the Trustee's prosecution of the Objection to Discharge.  Western Surety's decision three months later to enter into an agreed judgment with the Debtor stipulating that only $200,000.00 of the $2,729,777.53 debt would be non-dischargeable was done in exchange for the Debtor's agreement to begin paying Western Surety monthly installments totaling $27,000.00 for a period of 36 months, commencing January 2, 2015.  [Doc. No. 146, p. 3 n 2].

Western Surety emphasizes that the Applicant is incorrect in stating that the Trustee had no choice but to prosecute the Objection to Discharge.    Western Surety contends that the Applicant, on behalf of the Trustee, could have filed a motion to dismiss the Objection to Discharge and notified all creditors that the Trustee was seeking a dismissal because of Western Surety's concerns over the cost to the estate of prosecuting the Objection to Discharge.    And, if the Applicant, on behalf of the Trustee, had filed this motion, and if no creditor had objected, and if this Court had approved the motion, then the Trustee could have dismissed his Objection to Discharge without violating the law or his fiduciary duty.    Thus, Western Surety contends that the Trustee's refusal to file a motion to dismiss was—to use § 704(a)(6)'s language—not "advisable."  Under these circumstances, Western Surety argues that the Trustee has violated his § 704(a)(6) duty, and that therefore the Applicant should not receive a dime for prosecuting the Objection to Discharge.

Neither party submitted any briefing on what the phrase "if advisable" means under § 704(a)(6).  This Court has found one case that does address this ambiguous term:  *In re Mohsen*, 506 B.R. 96 (N.D. Cal. 2013).  There, both the debtor and his former attorney lodged objections to the fee application of the trustee's attorney.  *Id.* at 102.  Among other objections, they argued that it was not advisable for the trustee to have prosecuted an objection to discharge.  *Id.* at 107−08.  Indeed, the trustee did not ultimately prevail in this suit, so they assuredly believed their argument had particular potency.

In analyzing whether it was advisable for the trustee to prosecute her objection to discharge, the court cited no prior opinions; rather, it cited a treatise: Norton Bankruptcy Law and Practice 77:17 (3rd ed. 2008).  This treatise expresses the view that it is "advisable" for a trustee to prosecute an objection to discharge if "it will be of ***substantial*** benefit to the unsecured

creditors holding dischargeable debts." *Id.* at 107 (emphasis added).  The court then elaborated

on what constitutes a "substantial benefit" by citing this treatise once again:

> In deciding whether an objection to discharge will be of substantial
> benefit, and therefore advisable, the treatise identifies three general
> factors that trustees should evaluate: (1) whether grounds to object
> under § 727 exist; (2) whether any creditor has objected to discharge
> and, if so, the probable outcome of the objection; and (3) whether
> creditors will be substantially benefitted by continuing a debtor's
> liability for pre-petition debt.

*Id.*

Applying these three criteria, the court found that it was "advisable" for the trustee to

have prosecuted the objection to discharge.  First, there were grounds to object under § 727(a)(3)

because of the debtor's complex financial affairs and dearth of documentation.  *Id.* at 108.

Second, no other creditor had lodged an objection to discharge.  *Id.*  And, third, the debtor's

"history of wealth and untruthfulness gave Trustee a basis for believing that, if [the debtor's]

records were produced, it was likely that additional assets would be exposed and could be

liquidated for the benefit of Debtor's creditors."  *Id.*

The case at bar is unquestionably similar to *Mohsen* with respect to the first two

elements.  First, the Trustee had a sound basis to prosecute the Objection to Discharge under §§

727(a)(3), 727(a)(4) & 727(a)(5); the Debtor here had made misrepresentations under oath and

had also failed to produce numerous records, thus hindering the Trustee's ability to investigate

her financial affairs, as was discussed in this Court's memorandum opinion.  *See In re King*,

2014 WL 3056023 (Bankr. S.D. Tex. 2014).  Second, no other creditor in this case ever lodged

an objection to discharge.

The closer call is if the third element is present in this case: Would creditors be

substantially benefited by the Trustee's prosecution of the Objection to Discharge?  There is no

question that at the time the Trustee obtained a favorable ruling from this Court sustaining the

Objection to Discharge, the Trustee benefited all creditors by providing them with the opportunity to forever pursue the Debtor for the pre-petition debts that she owes to them.[15]  But, is this really a *substantial* benefit under the circumstances in this case?

Western Surety argues that it is not. The Applicant is now requesting fees of $50,856.25 for its prosecution of the Objection to Discharge.  [Finding of Fact No. 11].  If the Applicant had not prosecuted the Objection to Discharge, as requested by Western Surety, then this $50,856.25 would be available for distribution to unsecured creditors rather than just the $19,000.00 that is presently on hand for them.  [Finding of Fact No. 24].  Moreover, the remaining unsecured creditors hold such small debts that they are unlikely to spend time and money in the future seeking to collect the pre-petition debts for which the Debtor did not obtain a discharge.  Finally, all of the unsecured creditors must now stand in line holding their respective hats in hand for a 9.95% dividend while the Applicant seeks approval of its Fee Application in an amount that would represent a 66.93% dividend, with the Trustee himself to soon apply for his maximum statutory fee of $30,000.00 (i.e., a 15.71% dividend).  [*See* Finding of Fact No. 22].  Thus, if approved by this Court, the Trustee and his law firm would receive a total distribution of 82.64% versus 9.95% for the unsecured creditors.  [*See* Finding of Fact No. 24].  Under all of these circumstances, Western Surety argues that the creditors did not receive a substantial benefit from the Trustee's prosecution of the Objection to Discharge.

The Trustee asserts that he could not unilaterally dismiss his Objection to Discharge, and that therefore Western Surety's request for him to do so was unreasonable.  This Court does not entirely agree that Western Surety's request was unreasonable.  There is no question that the Trustee could not unilaterally dismiss the Objection to Discharge because Bankruptcy Rule 7041

---

[15] *See supra* n. 14 regarding how Western Surety gave up this benefit when it entered into an agreed judgment three months later with the Debtor.

61

expressly prevents such an action.  Fed. R. Bankr. Pro. 7041 ("[A] complaint objecting to the debtor's discharge shall not be dismissed at the plaintiff's instance without notice to the trustee, the United States trustee, and such other persons as the court may direct, and only on order of the court containing terms and conditions which the court deems proper.").  However, this rule does not completely bar dismissal of an objection to discharge under any circumstances.  Rather, it requires that notice to all creditors and parties-in-interest be given as to why the objection to discharge is to be dismissed.  Thus, the Trustee could have filed a motion with this Court giving notice to all creditors and parties-in-interest that he wanted to dismiss the Objection to Discharge in order to avoid incurring substantial attorneys' fees, and therefore to be able to distribute more funds to unsecured creditors.

There is no question that if the Trustee had taken such action, he would have been telegraphing to all unsecured creditors that Western Surety would be receiving the lion's share of the funds to be distributed to unsecured creditors and, moreover, that they would be losing the opportunity to later seek to collect their pre-petition debt owed to them by the Debtor.  At the hearing on the Fee Application, the Trustee seemed to suggest that his taking this action would have violated his fiduciary duties to the other unsecured creditors and would have undermined the integrity of the bankruptcy system.  This Court disagrees.  By giving notice to all creditors and parties-in-interest what relief was being proposed, the Trustee would have been giving every creditor a chance to object; and if any of them had done so, then this Court would have held a hearing and issued a ruling based upon the record made at that time.  Under these circumstances, it could hardly be argued that the Trustee would have violated his fiduciary duty to unsecured creditors.

In pushing forward with the Objection to Discharge, the Trustee arguably failed to give proper weight to the importance of the position of by far and away the largest creditor in the case, namely Western Surety.  Indeed, there is ample case law that in considering whether to approve a compromise under Rule 9019, "a court 'should carefully consider the wishes of the majority of the creditors.' "  *Matter of Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995).  Arguably, the same deference should apply in this instance.  Here, the only active unsecured creditor in the case—who happens to hold virtually all of the unsecured debt (i.e., 99.24%)—requested the Trustee not to go forward with the Objection to Discharge so that more of the estate funds on hand could be distributed to unsecured creditors.  And, instead of seeking this Court's approval to dismiss this suit, the Applicant, on behalf of the Trustee, proceeded to prosecute the matter and billed the estate a total of $50,856.25 for doing so.  [Finding of Fact No. 11].  This is a substantial figure and it underscores Western Surety's worst fears that the cost to the estate of trying this suit was not justifiable.  Under these circumstances, Western Surety's argument that the Applicant's prosecution of the Objection to Discharge did not *substantially* benefit all creditors has some merit.

And yet, this Court has difficulty ultimately finding fault with the Trustee for seeking to prevent the discharge of a debtor who unquestionably defiled the very temple of justice by lying under oath, failing to provide documents to the Trustee, and constantly obstructing the Trustee from his duty to administer the estate.  *See King*, 2014 WL 3056023, at *15.   The Court reconciles the positions of both parties by holding that in its view, the third element can be established by showing that unsecured creditors have received an identifiable benefit, as opposed to a *substantial* benefit, from the Trustee's successful prosecution of the Objection to Discharge—with this benefit being that they can still seek to collect the pre-petition debts owed

to them by the Debtor.  Thus, to the extent that *Mohsen* requires that a substantial benefit be proven to satisfy the third element, this Court disagrees, and concludes that only an identifiable benefit needs to be established.  And, because an identifiable benefit has been established due to the Trustee's successful prevention of the Debtor's discharge, the Court finds that it was "advisable" for the Trustee to prosecute the Objection to Discharge.[16]

And, because it was "advisable" for the Trustee to prosecute the Objection to Discharge, the Court finds that the Trustee properly carried out his duty under § 704(a)(6) and that the Applicant's services in this regard were reasonable and necessary.  Thus, except for any time entries related to the Objection to Discharge that are vague, lumped, or involved tasks that did not constitute "unique difficulties" beyond the Trustee's ability to handle, this Court finds that the fees associated with the entries related to the Objection to Discharge are compensable and should be allowed.[17]

### (2) Were the Services Rendered Relating to the Objection to Exemptions Reasonable and Necessary?

While the Applicant was successful in the prosecution of the Objection to Discharge, it was unsuccessful in the prosecution of the Trustee's Objection to Exemptions.  [Findings of Fact Nos. 12 & 16].  Western Surety contends that because this Court overruled the Trustee's Objection to Exemptions, the estate should not have to bear the expense of the $16,100.00 (44.8

---

[16] For guidance in the future, the Court notes that § 105(d)(1) states that any party-in-interest can request status conferences in a case "as are necessary to further the expeditious and economical resolution of the case." 11 U.S.C. § 105(d)(1).  Western Surety could have requested such a status conference immediately after the Trustee informed Western Surety that he would not seek a dismissal of the Objection to Discharge.  Western Surety could have used this status conference to attempt to pin down the Trustee on a budget for the prosecution of the Objection to Discharge so as to make a record of what could later be argued was an unreasonable fee for the prosecution of the suit.

[17] The Court notes that there are certain entries of Wentworth in the "Objection to Discharge" section of the timesheets that this Court has already disallowed because these services did not involve "unique difficulties" beyond the Trustee's ability to handle.  *See supra* Part V.D.5(b).

hours) of legal fees requested by the Applicant for prosecuting this objection.  [*See* Finding of Fact No. 17].

At the hearing on the Fee Application, Wentworth testified that he initially believed the Objection to Exemptions would be sustained because of his prior communications with the Debtor's ex-husband.  [Hr'g Tr. 10:24−11:8, Jan. 28, 2016].  However, Wentworth testified that once the hearing on the Objection to Exemptions began, the ex-husband gave testimony that contradicted his prior statements to Wentworth, and that his testimony undermined the Trustee's entire case-in-chief.  [Hr'g Tr. 11:9–15, Jan. 28, 2016].  Indeed, Wentworth testified that this Court correctly denied the Objection to Exemptions in the wake of hearing the ex-husband's testimony.  [Hr'g Tr. 11:9−15, Jan. 28,  2016].

Wentworth did not provide any detailed testimony about his communications with the Debtor's ex-husband prior to the hearing on the Objection to Exemptions.  For example, did he obtain sworn testimony (by affidavit, for example) that gave him a solid basis for believing that this witness would testify consistently at the hearing on the merits? Or, did Wentworth merely rely upon unsworn statements of this witness?  As a further example, did Wentworth personally meet with the ex-husband in order to prepare him for the trial on the Objection to Exemptions, which of course would have allowed Wentworth to assess this individual's credibility?  In other words, did Wentworth undertake sufficient "due diligence" to establish that it was a "good gamble" to go forward with the prosecution of the Objection to Exemptions?   Because Wentworth provided no testimony at the hearing on the Fee Application on these issues, this Court finds that the Applicant has failed to establish that prosecution of the Objection to Exemptions was a "good gamble."  Having failed to meet its burden of proof to establish that it was reasonable to prosecute the Objection to Exemptions, *see Evangeline*, 890 F.2d at 1326, the

Court finds that the fee request of $16,100.00 for services associated with the Objection to Exemption should be denied.

### (3) Were the Services Rendered Relating to the Sale of the Ranch Reasonable and Necessary?

Further, Western Surety complains about the amount of fees requested by the Applicant associated with negotiating and consummating the sale of the Ranch.  [Doc. No. 136, 3¶7]. Wentworth, however, testified that the sale of the Ranch was not a routine transaction.  [*See* Hr'g Tr. 18:12−20:2, Jan. 28, 2016].  Wentworth pointed out that the Ranch was owned by a separate entity in which the Debtor had a 50% interest due to her divorce, [Hr'g Tr. 18:16−20, Jan. 28, 2016]; and he further testified that there were problems identifying oil and gas interests beneath the surface of the Ranch. [Hr'g Tr. 18:24−19:1, Jan. 28, 2016].   Further, he testified that the other 50% of the Ranch was owned by a receiver who had been appointed in the receivership action against the Debtor's ex-husband.  [Hr'g Tr. 18:10−20:11; 36:15−17, Jan. 28, 2016]. Wentworth's credible testimony about the Ranch, which was unrebutted, convinces this Court that there were sufficiently "unique difficulties" regarding title issues associated with the Ranch that the Trustee needed the assistance of an attorney who specializes in real estate, and that the particular attorney here—Niehaus—rendered reasonable and necessary services on behalf of the Trustee.  Further, Wentworth's testimony—again, unrebutted—also convinces this Court that certain services rendered by Wentworth relating to the sale of the Ranch—for example, prosecuting the motion to sell the Ranch—were also reasonable and necessary services on behalf of the Trustee, [Hr'g Tr. 20:3−16; 35:10−17, Jan. 28, 2016]; stated differently, this was not a routine sale of property.  Thus, except for any time entries relating to the sale of the Ranch that are vague, lumped, or involved tasks that did not constitute "unique difficulties" beyond the Trustee's ability to handle—such as communicating with lienholders as to when the closing will

be held—this Court finds that the fees associated with Neihaus and Wentworth's entries are compensable and should be allowed.[18]

(4) Were the Services Rendered Relating to the Recovery of Estate
Property Reasonable and Necessary?

The Applicant's timesheets also contain time entries under the category of "Recover Property of the Estate." [Trustee's Ex. No. 1, pp. 5−6 of 11]. The Court has already disallowed many of these time entries as a result of the § 328(b) analysis. However, there are other entries which this Court approves. For example, there are entries from Wentworth relating to his preparation and taking of 2004 examinations. The Court finds that services such as these were reasonable and necessary and that the fees associated with these services should be approved.

*iv.   Whether the Amount of Time Billed for the Services was Excessive?*

After determining which services rendered by the Applicant were reasonable and/or necessary, this Court next determines whether the Applicant spent a reasonable amount of time rendering these services. *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) (stating that courts should exclude from attorneys' fees hours that are "are excessive, redundant, or otherwise unnecessary"); *League of United Latin Am. Citizens # 4552 (LULAC) v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1232 (5th Cir. 1997) (noting that any hours not reasonably expended should be excluded from consideration). The burden is on the party seeking payment of attorneys' fees to show that the hours requested are reasonable. *Evangeline*, 890 F.2d at 1326. Because this factor is listed in § 330, this Court affords it significant weight.

After reviewing the Fee Application, this Court concludes that a few of the time entries contain excessive hours or double billing among the attorneys. For example, On June 3, 2014,

---

[18] *See supra* Part V.D.5(b), where this Court has disallowed several of Wentworth's time entries relating to the Ranch which presented no "unique difficulties" beyond the Trustee's ability to handle.

Niehaus billed 0.50 for "Conference with T. Wentworth re offer to purchase minerals from estate entity and potential methods to handle same." [Trustee's Ex. No. 1, p. 7 of 11]. However, on the same day, Wentworth also billed 0.50 hours for "Conference with R. Niehaus regarding mineral offer for EAS property, telephone conference with B. Jackson regarding same." [Trustee's Ex. No. 1, p. 8 of 11]. It is excessive billing for both of these attorneys to charge time for the same conference with one another. *See In re Associated Grocers of Colorado, Inc.*, 137 B.R. 413, 429 (Bankr. D. Colo. 1990) ("On December 5, 1986 and December 22, 1986 it appears that each conferred with the same person simultaneously or at separate times. Each has billed at their full hourly rate of $400.00 and $395.00 per hour, respectively. The estate should not pay for such duplication of services where there is no indication why the services of two attorneys were necessary."). Thus, the Court disallows the fees of $197.50 associated with Wentworth's entry.

Further, on January 5, 2015, Wentworth billed 0.40 hours for "Conference with S. Wilson regarding securing Flatonia property." [Trustee's Ex. No. 1, p. 7 of 11]. On the same day, Wilson billed 0.20 hours for "Conference with T. Wentworth, assigning S. Wilson assignment to go out to [the Ranch] . . . ." [Trustee's Ex. No. 1, p. 8 of 11]. Again, it is excessive billing for both of these attorneys to charge time for the same conference with one another. Thus, the Court disallows the fees of $158.00 associated with Wentworth's entry.

Finally, on January 26, 2015, Wentworth billed 0.40 hours for "Conference with S. Wilson regarding inspection of [the Ranch], email to E. Engelhart regarding listing agreement." [Trustee's Ex. No. 1, p. 7 of 11]. On the same day, Wilson billed 0.30 hours for "Conference with T. Wentworth in regard to what is on the [Ranch], and upload pictures to client directory." [Trustee's Ex. No. 1, p. 8 of 11]. Once again, it is excessive billing for both of these attorneys to

68

charge time for the same conference with one another.  Thus, the Court disallows the fees of $158.00 associated with Wentworth's entry.

The Court notes that the fees associated with the time entries of Wentworth and Wilson from January of 2015 have already been deducted as a result of the § 328(b) analysis.  [*See supra* Part V.D.5(a)-(b)].  The Court's disapproval of these entries here is an alternative ruling.  However, the fees of $197.50 associated with Wentworth's entry of June 3, 2014 for his conference with Niehaus have not been deducted.  Therefore, with respect to excessive billing, the Court now finds that the amount of $197.50 should be deducted.

### b. Summary of Disallowed Fees After Completing Step No. 1 of Lodestar Approach

The chart set forth below reflects the total hours disallowed and the corresponding fees that this Court disallows:

| | | |
|---|---|---|
| Vague Time Entries: | 6.5  hours | $2,569.50 |
| Lumped Time Entries: | 84    hours | $33,180.00 |
| Not "Reasonable and Necessary" Entries: | 44.8 hours | $16,100.00 |
| Excessive Time that was billed: | 0.5  hours | $197.50 |
| **TOTAL DISALLOWED**: | **135.8 hours** | **$52,047.00** |

Thus, this Court will deduct $52,047.00 from $102,573.75 (i.e., the amount of fees associated with those services that survived the § 328(b) analysis).   The resulting figure of $50,526.75 represents the non-excessive fees billed by the Applicant for services that this Court finds were necessary or reasonable—or both. The first step in the lodestar method is therefore complete.

2. Step No. 2 under the Lodestar Approach: Determining whether the Applicant's hourly rates are reasonable

After determining which time entries are compensable, the Court now calculates the reasonable hourly fee for the services described in those entries. The Court accords this factor the same weight as the number of hours spent on compensable services.

The Court determines a reasonable hourly billing rate by evaluating the prevailing market rate in the relevant legal community. *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381 (5th Cir. 2011). This Court may rely on its knowledge of customary billing practices in the local community to determine a reasonable rate. *Matter of Lawler*, 807 F.2d 1212 (5th Cir. 1987); *see also In re El Paso Refinery, L.P.*, 257 B.R. 809, 832 (Bankr. W.D. Tex. 2000); *In re Weaver*, No. 13–10–12204 JA, 2011 WL 867136, at *3 (Bankr. D.N.M. Mar. 11, 2011). By virtue of sitting as a bankruptcy judge in the Southern District of Texas, Houston Division, the undersigned judge is aware of the hourly rates of attorneys from other firms who appear in this District representing Chapter 7 trustees. Given their experiences and competences, the rates of the attorneys in this case are comparable to the rates of various other attorneys who represent Chapter 7 trustees in Houston. For example, Wentworth's hourly rate of $395.00 is certainly comparable to the hourly rates of Rhonda Chandler ($350.00),[19] Erin Jones ($350.00),[20] Joshua Wolfshohl ($485.00),[21] and Julie Koenig ($425.00),[22] all of whom have similar legal experience to Wentworth in representing Chapter 7 trustees. Further, Wilson's hourly rate of $230.00 is

---

[19] *See* Doc. No. 54-1, in the Chapter 7 case of *In re Clear Ventures, Inc.*, Case No 15-80092 (Bankr. S.D. Tex. 2015).

[20] *See* Doc. No. 38, p. 3, in the Chapter 7 case of *In re Source Two Spares, Inc.*, Case No. 15-31658 (Bankr. S.D. Tex. 2015).

[21] *See* Doc. No. 62, p. 2, in the Chapter 7 case of *In re Mining Oil, Inc.*, Case No. 15-30427 (Bankr. S.D. Tex. 2015)

[22] *See* Doc. No. 22, p. 6, in the Chapter 7 case of *In re Schaumburg*, Case No. 15-32951 (Bankr. S.D. Tex. 2015).

comparable to the hourly rate of Amy Tellegen ($320.00),[23] who has similar legal experience to Wilson in representing Chapter 7 trustees. Further, the hourly rate of another junior associate who provided services in this case—Vianey Garza ($150.00)—compares favorably to the hourly rate of Ms. Tellegen ($320.00). In sum, the Court finds that the hourly rates of the Applicant's attorneys in this case are reasonable given the prevailing rates in the community.

Given that the hourly rates of the attorneys employed by the Applicant are comparable to the hourly rates of attorneys at other firms in Houston who represent Chapter 7 trustees, this Court finds that the Applicant's hourly rates are reasonable and that therefore, with one exception, there should be no adjustment—either upward or downward—in the total lodestar fee.

The exception concerns services rendered by Wentworth on May 30, 2014. This entry relates to the Objection to Discharge and reads as follows: "Preparation of exhibits for trial." [Trustee's Ex. No. 1, p. 3 of 11]. Wentworth billed 2.9 hours for this task; and because his hourly rate is $395.00, the total amount billed to the estate was $1,145.50. The Court finds that the hourly rate of $395.00 for assembling exhibit booklets is too high. Bankruptcy Local Rule 9013-2(e) requires that exhibits be tabbed and bound, and that sufficient exhibit booklets be brought to the courtroom for distribution to the Court, the courtroom deputy, the witness, opposing counsel, and counsel who wants to introduce the exhibits. So, there is no question that these services needed to be rendered for the trial on the Objection to Discharge. However, these services should be rendered by a paralegal[24] whose hourly rate is much lower than $395.00 per hour. In fact, the Court notes that the Applicant used no paralegals at all in prosecuting the Objection to Discharge or the Objection to Exemptions. The Court urges the Applicant to

---

[23] *See* Doc. No. 147, p. 2, in the Chapter 7 case of *In re Tony DeRosa-Grund*, Case No. 09-33264 (Bankr. S.D. Tex. 2009).

[24] If Wentworth really believed that he, as opposed to a paralegal, needed to assemble the exhibit booklets, then he needed to provide testimony at the hearing on the Fee Application to justify this additional expense to the estate.

consider use of paralegals in the future for such tasks as assembling exhibit booklets.   In this instance, the Court finds that the appropriate hourly rate is $110.00, which is the hourly rate of the Applicant's paralegals that was disclosed in the Second Amended Application to Employ. [Doc. No. 86, p. 12 of 14].   Thus, the value of the services rendered is $110.00 times 2.9 hours, which equals $319.00.   Because Wentworth billed $1,145.50, the amount of $826.50 needs to be deducted.

Thus, the total lodestar fee is $49,700.25, which is derived as follows:

| | |
|---|---|
| Amount of Fees Associated with Those Services that Survived the § 328(b) Analysis: | $102,573.75 |
| (Less) | - |
| (1) amount deducted for vague entries (**Part V.E.1(a)(i)**): | $2,569.50 |
| (2) amount deducted for lumped entries (**Part V.E.1(a)(ii)**): | $33,180.00 |
| (3) amount deducted for services that were neither necessary nor reasonable (**Part V.E.1(a)(iii)(2)**): | $16,100.00 |
| (4) amount deducted for excessive billing (**Part V.E.1(a)(iii)(3)(iv)**): | $197.50 |
| (5) amount deducted for unreasonable rate for Wentworth with respect to assembling of exhibit booklets (**Part V.E.2**) | $826.50 |
| **Lodestar Fee** | **$49,700.25** |

## F. Adjusting the Lodestar fee

1. Applying the Twelve Johnson Factors Result in no Adjustment to the Lodestar Fee

This Court, in its discretion, may consider whether the lodestar fee of $49,700.25 should be adjusted upward or downward to account for factors not considered during the lodestar calculation.   *Pilgrim's Pride*, 690 F.3d at 655.   In assessing whether to make an adjustment, the Court may consider, among other factors, the twelve factors articulated in *Johnson*: "(1) The

time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to acceptance of the case; (5) The customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or other circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; (12) Awards in similar cases." *Johnson*, 488 F.2d at 716.

In applying each of the twelve factors, this Court concludes that several of the factors were already subsumed in its calculation of the lodestar fee. First, in evaluating the number of hours the Applicant reasonably expended in the main case and in the adversary proceeding on the Objection to Discharge, the Court has considered the novelty and difficulty of the questions presented, the time and labor required to complete necessary task, and the skill needed to perform the legal services properly. The Court acknowledges that a few of the issues that the Applicant confronted involved relatively complex questions of law, and that a certain level of skill and expertise in bankruptcy and real estate law was required to represent the estate. Even considering this relative complexity, the Court has found a certain amount of inappropriate billing in the fee statements that—as already discussed in detail above—warrants a decrease in the number of hours reasonably expended by the Applicant. Additionally, in evaluating the reasonableness of hourly rates billed in the fee statements, the Court has considered whether the professionals employed by the Applicant have charged a customary fee, and has also examined the relative experience, reputation, and ability of the attorneys involved. Under all of these circumstances, the Court will not adjust the lodestar fee of $49,700.25 either upwards or downwards based upon further consideration of these *Johnson* factors. *Saizan v. Delta Concrete*

*Products Co., Inc.*, 448 F.3d 795, 800 (5th Cir. 2006) ("The lodestar may not be adjusted due to a *Johnson* factor . . . if the creation of the lodestar amount already took that factor into account; to do so would be impermissible double counting.").

Further, the Court concludes that a number of the *Johnson* factors are not relevant to an evaluation of the reasonableness of attorneys' fees in this case. Indeed, certain factors—such as preclusion of other employment due to acceptance of the case, whether the case involves a fixed or contingent fee, the time limitations imposed by the client or other circumstances, the "undesirability" of the case, and the nature or length of the professional relationship with the client—are factors which bear more relevance in a fee-shifting case. *In re El Paso Refinery, L.P.*, 257 B.R. 809, 826 (Bankr. W.D. Tex. 2000). Typically, preclusion of employment presumes that an attorney does not generally engage in the sort of representation for which fees are being requested and, therefore, is prevented from undertaking a customary amount of additional work due to the increased time demand of that particular case. *See id.* at 826, n. 30. The professionals involved in the case at bar, and in the adversary proceeding associated therewith, may have been precluded from representing other clients, but such preclusion is simply due to the natural limitations on billable hours, as the fees sought by the Applicant are fixed per hour, rather than on a contingency fee basis.[25] Consideration of the time limitations imposed by the client or other circumstances likewise does not add to the analysis, as similar limitations are present in all bankruptcy related representations.

While this Court notes that litigating the various issues presented in this case could certainly be construed as less than desirable, the relative "undesirability" of a bankruptcy case or related adversary proceeding arguably does not have the same effect as in contingency fee cases.

---

[25] The Court notes that the Applicant provided no testimony indicating that the Applicant was precluded from representing other clients as a result of its representation of the Trustee in the case at bar.

Nevertheless, the Court does not find cause to adjust the Applicant's fees based on the "undesirability" of this case or the one adversary proceeding associated therewith.

Finally, in calculating the lodestar fee in this case, the Court has taken into consideration the results that the Applicant obtained.  In some instances, the Court has awarded most or all of the fees requested by the Applicant due to the results obtained—for example, the litigation involving the Objection to Discharge.[26]   Conversely, in other instances, the Court has reduced the fees—for example, the Court has denied the fees associated with the Applicant's prosecution of the Objection to Exemptions.[27]   Thus, having already considered the results obtained in arriving at the lodestar fee, the Court finds that no further adjustment, upward or downward, should be made. *Saizan*, 448 F.3d at 800 ("The lodestar may not be adjusted due to a *Johnson* factor . . . if the creation of the lodestar amount already took that factor into account; to do so would be impermissible double counting.").

2. Consideration of all other "equitable factors" in this case results in further reduction of the Lodestar fee

Aside from adjusting the lodestar fee based upon the twelve *Johnson* factors, this Court may consider other factors as well.  In his concurring opinion in *Woerner*, Judge Grady Jolly contextualized this broad discretion within the new framework:

> (1) a court is permitted, but not required, to award fees under § 330 for services that could reasonably be expected to provide an identifiable, material benefit to the estate at the time those services were performed (or contributed to the administration of the estate); and (2) **courts may consider all other relevant equitable factors**, as stated in § 330(a)(3), including as one of those factors, when appropriate, whether a professional service contributes to a successful outcome.

---

[26] *See supra* Part V.E.1(a)(iii)(1).

[27] *See supra* Part V.E.1(a)(iii)(2).

783 F.3d at 278 (Jolly, J., concurring) (emphasis added).  Further, though Judge Prado's majority opinion in *Woerner* clarifies that bankruptcy courts *may* award compensation for failed efforts as long as the efforts were reasonable, it "is not intended to limit courts' broad discretion" to consider "all relevant factors," including the ultimate outcome of the case.  *Id.* at 277.  In the case at bar, this Court now exercises its discretion to "consider all other relevant factors," and in doing so, finds that further reduction of the lodestar fee is appropriate for three reasons.

> a. *Reason Number One for Reducing the Lodestar Fee: The Trustee's Failure to Properly Supervise his own Firm*

The Trustee is one of three name partners of the Applicant law firm.  It is black letter law that the Trustee has a fiduciary duty to the creditors of this Chapter 7 estate.  *See* 11 U.S.C. § 704(1); *Dodson v. Huff (In re Smyth)*, 207 F.3d 758, 761 (5th Cir. 2000); *In re Melenyzer*, 140 B.R. 143, 154 (Bankr. W.D. Tex. 1992) ("A bankruptcy trustee is a fiduciary of the estate's creditors, and his duty to collect and "conserve the assets of the estate and to maximize distribution to creditors" is a fiduciary obligation.").  It is very disconcerting to this Court that the Trustee has allowed his own law firm to attempt to charge the estate for certain services that are unquestionably non-legal services.  The most egregious example of this dereliction of duty is to allow Wilson, an associate attorney who is billed at $230.00/hour, to charge the estate a total of $2,967.00 for driving back and forth to the Ranch in order to ensure that the locks are changed and that the property is secured.   Because this is such a blatant example of a non-legal service that should never be charged by an attorney to the estate, the Court finds that it is appropriate to reduce the lodestar fee by the same amount that the Trustee allowed the Applicant to seek to charge the estate.  Granted, the Court has already denied the $2,967.00,[28] but another deduction of $2,967.00 is appropriate for the Trustee's violation of his fiduciary duty.

---

[28] *See supra* Part V.D.5(a).

  *b. Reason Number Two for Reducing the Lodestar Fee: The Trustee's Misrepresentation
   in the Applications to Employ*

   In the Amended Application to Employ, and in the Second Amended Application to

Employ, in footnote number 1, the Trustee made the following representation to the Court: "The

initial review and assessment of claims filed in the debtors' cases is routinely undertaken by the

trustee or his paralegals and law clerks without incurring legal fees." [*See* Findings of Fact Nos.

4, 5 & 6]. Yet, on December 19, 2013, Wentworth billed 0.60 hours ($237.00) for "Review of

claims, conference with JMH [i.e., the Trustee] regarding settlement terms." [Trustee's Ex. No.

1, p. 11 of 11]. And, on November 2, 2015, Wentworth billed 0.90 hours ($355.50) for "Work

on claims." *Id.* Thus, Wentworth billed a total of 1.5 hours ($592.50) for doing exactly what

the Trustee represented to this Court that he himself would do. This Court finds it disturbing that

the Trustee, in requesting this Court to approve the retention of his own firm to represent him,

twice represented that he himself would initially review claims so that the estate would incur no

fees. It is conceivable that the Trustee actually did an initial review of claims, and then decided

that there were "unique difficulties" beyond his ability to resolve that led him to ask Wentworth

to review these claims. This Court's review of the entire docket sheet, however, reflects that no

objections were ever lodged to any proof of claim filed in this case. Moreover, Wentworth gave

no testimony at the hearing on the Fee Application as to why his review of these claims was

necessary. Given all of these circumstances, this Court finds that a further reduction of $592.50

should be made to the fee request.

  *c. Reason Number Three for Reducing the Lodestar Fee: The Applicant, on Behalf of
   the Trustee, Failed to Obtain Approval of the $4,000.00 Settlement that he
   Effectuated with the Debtor Regarding Certain Exemptions*

   On July 17, 2013, the Applicant, on behalf of the Trustee, filed the Objection to

Exemptions. [Finding of Fact No. 12]. The Objection to Exemptions contained three specific

objections: (1) that the Debtor was attempting to exempt jewelry the value of which was in excess of the $7,500.00 limit available to her; (2) the Debtor was attempting to exempt artwork and other personal property the value of which was in excess of the $30,000.00 limit available to her; and (3) the Debtor was attempting to exempt six life insurance policies the premium payments for which were fraudulently made by the Debtor. [Doc. No. 61]. The Debtor filed a response in opposition thereto. [Finding of Fact No. 13].

This Court began the hearing on the Objection to Exemptions on November 13, 2013. [Finding of Fact No. 15]. At the beginning of this hearing, the Court inquired as to whether the parties had reached any settlements. Both Wentworth and counsel for the Debtor responded that no settlements had been reached. [Hr'g held on Nov. 13, 2013, at 9:34:25−9:34:30 A.M.]. The Court therefore held the hearing, listened to testimony, and then overruled the Objection in its entirety.

However, at the hearing on the Fee Application, this Court, for the first time, learned that the Trustee had, in fact, settled a portion of the Objection to Exemptions with the Debtor. The Court discovered this fact when Wentworth, giving narrative testimony in support of the Fee Application, testified as follows:

> We filed an objection to the Debtor's exemption on two grounds: That those items had been undervalued or not scheduled and that the -- there was an objection to the exemptability of the seven insurance policies.
>
> *We -- after getting the appraisals, we were able to settle part of the exemptions relating to the jewelry and the appraisals. The Debtor was allowed to keep her $15,000 maximum under Texas State law and she turned over approximately $4,000 to us, so we were successful on the exemptions to that extent.*
>
> The remainder of the exemption was tried before the Court in an evidentiary hearing at which time Mr. Boutte and Ms. King testified, and this was relating to the insurance policies.

[Hr'g Tr. 9:23−11:2, Jan. 28, 2016] (emphasis added).

The Applicant, on behalf of the Trustee, never filed a motion to compromise the Objection to Exemptions. Rule 9019(a) expressly requires that any trustee file such a motion and provide notice to all creditors in order that they may review the terms of the settlement and object to them. *See, e.g.*, *American Prairie Construction Co. v. Hoich*, 594 F.3d 1015, 1024 (8th Cir. 2010) ("[A] settlement agreement made in bankruptcy has no effect when the parties to the agreement fail to comply with Fed. R. Bankr. P. 9019, which requires notice to creditors and court approval."); *In re Fleming Packaging Corp.*, 2008 WL 682428, at *3 (Bankr. C.D. Ill. Mar. 7, 2008) (determining that "all compromises are subject to court approval under Rule 9019(a) and that a compromise is of no effect until it is approved by the bankruptcy court"); *In re Rothwell*, 159 B.R. 374, 379 (Bankr. D. Mass. 1993) ("A settlement agreement is unenforceable without notice of the settlement to creditors or a court order approving it . . . [t]herefore, from the point of view of the bankruptcy estate the [settlement] is without effect.").

In the case at bar, it is particularly disturbing to this Court that the Applicant failed to file such a motion on behalf of the Trustee. This Court approved the Trustee's application (which the Applicant filed) to retain appraisers for the jewelry and the artwork, and estate money was used to pay these two professionals. [Doc. Nos. 28 & 41]. Their work led the Applicant, on behalf of the Trustee, to file the Objection to Exemptions, and in this pleading, the Trustee represented that the Trustee's appraiser estimated that the fair market value of the Debtor's jewelry was $24,885.00—which is $17,385.00 more than the Debtor was entitled to exempt for jewelry under the applicable Texas Property Code section in effect at that time. [Doc. No. 61, pp. 1¶3−2¶4]. Under these circumstances, this Court is wondering why the Trustee settled with the Debtor by allowing her to keep all of her jewelry in exchange for her merely paying the sum

of $4,000.00 to the Trustee?  Stated differently, if the jewelry was worth $17,385.00 more than the $7,500.00, then why did the Trustee settle for paltry sum of $4,000.00?  If the Applicant, on behalf of the Trustee, had filed a motion to compromise under Rule 9019(a), then this Court would have scheduled a hearing, and the Trustee could have testified as to the reasonableness of this settlement—and any objecting creditors could have rebutted such testimony.  The fact that the Applicant, on behalf of the Trustee, failed to comply with a fundamental rule merits a reduction in the Fee Application.[29]

This Court, exercising its equitable discretion, finds that because the Trustee is a name partner of the Applicant, because the Applicant is well-versed in knowing that settlements need to be approved under Rule 9019(a), and because the Applicant, on behalf of the Trustee, negotiated and effectuated a $4,000.00 settlement with the Debtor without obtaining this Court's approval, a $4,000.00 reduction in the Fee Application is appropriate.

In sum, giving consideration to all other "equitable factors" in this case, the Court finds that an aggregate reduction of $7,559.50.

Thus, a deduction of $7,559.50 from the lodestar fee of $49,700.25 results in **final lodestar fee of $42,140.75**.

## G. Whether the Expenses Requested are Reasonable

The Applicant has requested a total of $4,560.03 in reimbursable expenses.  [Doc. No. 133, Exs. D & G].  The Court finds that, with two exceptions, the expenses for which reimbursement is requested are reasonable.

First, the Court finds that the Applicant's request for $725.69 for "Westlaw Research" is not reasonable.  [Trustee's Ex. No. 2].  Online legal research is a cost that is reflected in an

---

[29] After the Court took the Fee Application under advisement, but before the Court issued this Memorandum Opinion, the Court held a telephonic hearing to inquire of Wentworth as to why no motion to compromise under Rule 9019(a) was filed.  Wentworth could provide no acceptable explanation to this Court.

attorney's billing rate and is therefore subsumed into attorneys' fees.  *See Embotelladora Agral*

*Regiomontana, S.A. de C.V. v. Sharp Capital, Inc.*, 952 F. Supp. 415, 418 (N.D. Tex. 1997).  As

the Seventh Circuit explained:

> The added cost of computerized research is normally matched with a
> corresponding reduction in the amount of time an attorney must spend
> researching. Therefore, we see no difference between a situation where
> an attorney researches manually and bills only the time spent and a
> situation where the attorney does the research on a computer and bills
> for both the time and the computer fee. In both cases the total costs are
> attorney's fees and may not be recovered as "costs."

*Haroco, Inc. v. Am. Nat. Bank & Trust Co. of Chicago*, 38 F.3d 1429, 1440–41 (7th Cir. 1994).

Therefore, the Westlaw research fees the Applicant requests are already factored into the hourly

rates of the professionals employed by the Applicant.  To award these fees as reimbursable

expenses would therefore represent double-counting, which is unreasonable.  The Court

consequently denies all $725.69 for the requested "Westlaw Research."

Second, the Applicant seeks to recover $122.08 ($62.72 + $59.36) for mileage

reimbursement relating to Wilson's trip to the Ranch on January 23, 2015, and his return trip to

Houston on January 24, 2015.  [Trustee's Ex. No. 2, p. 2 of 2].  This is an expense to which the

Applicant is not entitled to reimbursement because, as already discussed herein, the trip to the

Ranch constitutes a non-legal service.  Stated differently, the trip to the Ranch falls within the

normal duties of the Trustee, and any mileage for driving to the Ranch is an expense of the

Trustee, not the Applicant.  When the Trustee eventually files his application for trustee's

compensation and expenses pursuant to §§ 330(a)(1) and (a)(7), the Trustee may request

reimbursement of this $122.08 at that time.

Other than these two exceptions, the Court has reviewed the two-page list of expenses,

[Trustee's Ex. No. 2], and finds that they are reasonable.  Most of these expenses are for postage

and copying—i.e., routine expenses incurred by any law firm.  Indeed, the firm charges only $0.20 per page for copying, which is eminently reasonable.

In sum, the Court will allow $3,712.26 and deny $847.77 of the requested $4,560.03 in expenses.

## H.  Whether the Amount Requested for Preparing the Fee Application is Reasonable

Finally, the Court turns to whether the Applicant is entitled to the $2,449.00 it has requested for preparing the Fee Application.  Although the Supreme Court has determined that bankruptcy professionals are not entitled to compensation for *defending* a fee application, they are entitled to reasonable fees and expenses incurred in simply *preparing* a fee application. *Baker Botts, L.L.P. v. ASARCO, L.L.C.*, 135 S. Ct. 2158, 2167 (2015) ("Section 330(a)(1) . . . authorize[s] . . . 'reasonable compensation for actual, necessary services rendered by' the § 327(a) professional . . . . A § 327(a) professional's preparation of a fee application is best understood as a 'servic[e] rendered' to the estate administrator under § 330(a)(1), whereas a professional's defense of that application is not."); *Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088, 1093 (5th Cir. 1980).  While the Fifth Circuit has not set a definitive cap on what is considered reasonable for preparation of a fee application, many courts limit such awards to 5% of the total amount requested in a fee application.  *See, e.g.*, *In re Mesa Air Grp., Inc.*, 449 B.R. 441, 445 (Bankr. S.D.N.Y. 2011); *In re New Boston Coke Corp.,* 299 B.R. 432, 446 (Bankr. E.D. Mich. 2003).  In *Rose Pass Mines*, the Fifth Circuit reversed an award of $3,850.00 for a $59,000.00 fee application, representing approximately 6%.  615 F.2d at 1092−93.  In that case, the Fifth Circuit was particularly disturbed that the attorney requesting the fees spent "almost an entire work week" compiling data for the fee application.  *Id.* at 1093.  Here, Wentworth, on behalf of the Applicant, spent 5.2 hours reviewing time entries and drafting a 10-page fee

application.   Moreover, the $2,449.00 that the Applicant has requested for preparing the Fee

Application represents less than 2% of the amount requested for the services rendered to the

Trustee; further, it represents less than 6% of the amount of fees this Court is actually awarding

the Applicant.   Under these circumstances, this Court finds that the $2,449.00 in fees that the

Applicant has requested for preparing the Fee Application is reasonable, and allows this amount

in full.   As the Fifth Circuit stated in *Rose Pass Mines*: "We have long required an attorney to

file a detailed account of the legal services he provided the bankrupt in order to recover any

compensation at all for his services. It would be unduly penurious to require such an accounting

without granting reasonable compensation." *Id.*

## VI. CONCLUSION

The Applicant requests this Court to approve fees totaling $123,282.25 and expenses

totaling $4,560.03, for an aggregate amount of $127,842.28.   For the reasons set forth in this

Opinion, the Court approves fees only in the amount of $42,140.75 and expenses in the amount

of $3,712.26, for an aggregate amount of $45,853.01.   The Court disapproves fees in the amount

of $81,141.50 and expenses in the amount of $847.77, for an aggregate amount of $81,989.27.

This disapproved amount of $81,989.27 will be distributed to the unsecured creditors.   Thus,

these creditors, at a minimum, will receive a total amount of $100,989.27 (i.e., $81,989.27 plus

existing funds for unsecured creditors of $19,000.00) rather than just $19,000.00.[30]   [*See* Finding

of Fact No. 24].

---

[30] Indeed, the creditors could receive more than $100,989.27 if this Court subsequently decides not to approve the Trustee's eventual request that he receive the maximum amount of his statutory fee as calculated under § 326(a). According to Wentworth's testimony, the figure of $30,000.00 is the maximum amount that the Trustee can receive. [*See* Finding of Fact No. 22].   However, this Court has the discretion to award a lesser amount. *Coyote Ranch Contractors*, 400 B.R. at 95; *Phillips*, 392 B.R. at 385. If it does so, then the difference between $30,000.00 and the actual amount awarded to the Trustee would also be distributed to the unsecured creditors.   What amount this Court awards to the Trustee will be determined as a separate hearing to be set after the Trustee files an application requesting his statutory fee.

Having done the math, this Court could stop.  However, the Applicant's fee request, and the Trustee's wholehearted endorsement of this request, are sufficiently egregious that the Court feels compelled to go further.   In the Original Application to Employ, in his Amended Application to Employ, and in his Second Amended Application to Employ, the Trustee, in order to convince this Court to approve his retention of his own law firm to represent him, made the following representation: "Trustee is a partner in the law firm and such fact will ensure employment of Cage, Hill & Niehaus L.L.P. will be in the best interest of creditors and this estate. Trustee's presence ensures greater control and fee monitoring as further described on Exhibit A."[31]  [Doc. No. 18, p. 2]; [Doc. No. 25, p. 2]; [Doc. No. 86, p. 2].

Nothing could be further from the truth.  In this case, the Trustee has exhibited woeful control and fee monitoring of his firm, and his willingness to let his firm seek fees from the estate in the amount of $123,282.25 is assuredly not in the best interest of creditors and the estate.  Indeed, his firm is seeking compensation for many services that have nothing to do with the practice of law and have everything to do with the ordinary duties that any trustee can fulfill without having to receive legal advice.  Moreover, the Trustee is not even requiring his own law firm to abide by the "lumping" guidelines imposed by the very U.S. Trustee that appointed him to serve on the Chapter 7 panel.  If this Court approves all of the fees requested, the Trustee, as a partner of the Applicant, will receive a financial windfall, leaving creditors of the estate to receive less of a distribution for every dollar that is paid to the Applicant.  Thus, by endorsing his own firm's prosecution of the Fee Application at bar, the Trustee is violating his fiduciary duties to the creditor body.  *Melenyzer*, 140 B.R. at 154; *In re First State Bancorporation*, 2013 WL 823414, at *7 (Bankr. D.N.M. Mar. 3, 2013).  This, the Court cannot countenance.

---

[31] Exhibit A attached to the applications to employ is a chart setting forth the names of the attorneys at the firm and their respective hourly rates.

While the Code expressly allows a trustee to retain his own law firm to represent him in his capacity as a trustee, this is not a license for the trustee and his firm to milk the estate for all it is worth.  That is why § 328(b) prevents a trustee's firm from receiving fees for tasks that ordinarily are performed by a trustee.  The congressional intent in enacting this provision was very explicit:

> The purpose of permitting the trustee to serve as his own counsel is to reduce costs. It is not included to provide the trustee with a bonus by permitting him to receive two fees for the same services or to avoid the maxima fixed in section 326. Thus, this subsection requires the court to differentiate between the trustee's services as trustee, and his services as trustee's counsel, and to fix compensation accordingly.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 328–329 (1977); S.Rep. No. 95–989, 95th Cong.2d Sess. 39 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5825, 6285.

Pursuant to congressional intent and the Fifth Circuit's directive for bankruptcy courts to serve as "keepers of the temple," *IFS Financial*, 803 F.3d at 209, this Court will now impose procedures to ensure, as much as possible, that whenever a Chapter 7 trustee retains his own law firm to represent him, the firm does not receive fees for services that the trustee should provide in his capacity as trustee.  Specifically, in the future, for every fee application that a trustee's own law firm files, this Court will hold a hearing—even if no objections are lodged—and, at a minimum, require the trustee himself to give testimony explaining how the services rendered by the firm involve "unique difficulties" beyond the trustee's own ability to resolve.  *See Knapp*, 930 F.2d at 388.  The Court notes that in the case at bar, the Trustee was conspicuous by his absence on the witness stand.  This will not happen again. Moreover, at any such hearing, the Court will require the U.S. Trustee to attend and participate.  After all, "[o]ne of the United States trustee's principal *raisons d'etre* is to guard and protect the bankruptcy system . . . ."  *In re Dow Corning Corp.*, 194 B.R. 147, 148 (Bankr. E.D. Mich. 1996).  Here, in order to ensure that

the very individuals that the U.S. Trustee has chosen to serve on the Chapter 7 trustee panel properly monitor fees that their own law firms seek from the estate, it is entirely appropriate to have the U.S. Trustee appear at these hearings.

Finally, this Court ends with the following observations. The Court has spent a ***substantial*** amount of time reviewing the Applicant's timesheets in order to determine whether the services rendered are compensable—or not. The need to do so is a reminder that any law firm seeking fees from the estate can successfully "nickel and dime" the process to death by submitting detailed timesheets which, if only superficially reviewed, appear compensable; only when they are scrutinized closely, sometimes with the aid of an objecting creditor and testimony, does it become apparent that they are non-compensable. These circumstances underscore the importance of the Fifth Circuit's point in *IFS Financial* that the bankruptcy courts "rely on the bar to abide by its strict rules and norms of conduct." 803 F.3d at 209. In taking the substantial time that it has to scrutinize the Applicant's timesheets in the case at bar and in writing this Memorandum Opinion, the Court wants to emphasize to all Chapter 7 trustees in this district, and all the trustee-affiliated law firms who represent them, that they need to pay heed to § 328(b) so that they are not billing the estate for providing non-legal services or legal services that do not involve "unique difficulties" beyond the trustees' ability to handle. *See Knapp*, 930 F.2d at 388. To the extent that the trustees and their law firms contend that they have always billed for such services—and that therefore they have been abiding by the norms of the system—this Opinion is intended to disabuse them of believing that they can do so in the future—at least in cases pending before the undersigned judge. Henceforth, this Court will be closely reviewing every entry of their timesheets to ensure that they are not improperly billing the estate.

The Court directs the United States Trustee to distribute this Memorandum Opinion to all of the panel Chapter 7 trustees in the Southern District of Texas so that they are aware of what the undersigned judge will require in the future if any of these trustees decide that they want to retain their own law firm to represent them in their capacity as a trustee.

An order consistent with this Memorandum Opinion will be simultaneously entered on the docket.

Signed on this 18th day of March, 2016.

Jeff Bohm
United States Bankruptcy Judge